TELECO, INC., d/b/a Telephone Electronics Co., an Oklahoma Corporation, Appellant,

v.

FORD INDUSTRIES, INC., a corporation, Professional Office Systems, Inc., a corporation, Gordon Gray and James Bridges, Appellees.

No. 50928.

Supreme Court of Oklahoma.

Dec. 19, 1978.

Eagleton, Nicholson & Pate, J. Stanley Gill, Oklahoma City, for appellant.

Andrews, Mosburg, Davis, Elam, Legg & Bixler, Inc., Oklahoma City, for appellee, Ford Industries, Inc.

BARNES, Justice:

Appellant, Teleco, Inc., brought an action seeking money damages against several defendants, including Ford Industries, Inc., the manufacturer of telephone answering devices known as "Code-A-Phones", alleging violations of Oklahoma antitrust statutes, found at 79 O.S.1971, §§ 1, et seq.

In its petition, Teleco alleged five separate causes of action. Upon the basis of depositions, answers to interrogatories, and other evidence submitted below, the Trial Court granted summary judgment in favor of Ford on two of the causes of action. Teleco has perfected a timely appeal from the Trial Court's granting of that summary judgment.

Before addressing the issues presented in this case, we first note that the provisions of this State's antitrust statutes are similar to Federal legislation, and that interpretation of Federal antitrust legislation provides valuable assistance in interpreting the provisions of the Oklahoma statutes.[1] Interpretation of Section 1 of the Sherman Antitrust Act,[2] 15 U.S.C., § 1, is particularly useful in interpreting Section 1 of Title 79, as those two sections are virtually identical. Title 79 O.S.1971, § 1, provides:

"Every act, agreement, contract, or combination in the form of trusts, or oth-

erwise, or conspiracy in restraint of trade or commerce within this state is hereby declared to be against public policy and illegal."

Both of Teleco's causes of action are contingent upon there being a conspiracy in restraint of trade and commerce in violation of Section 1 of Title 79. The basic facts giving rise to the alleged conspiracy in restraint of trade are as follows:

Since 1967, Teleco had been an authorized distributor of Ford, selling "Code-A-Phones" in Oklahoma. In 1973, Teleco agreed to surrender Tulsa as part of its assigned territory. The following year, on October 7th, Ford gave Teleco sixty days written notice that its contract as an authorized Ford distributor was being terminated, pursuant to provisions of that contract. Subsequently, a new Ford distributor was established.

Teleco's basic contention is that a conspiracy existed between Ford and the new distributor to restrict trade in a relevant submarket, and that the cancellation of its distributorship, coupled with the establishment of a new distributorship, and Ford's refusal to continue to sell Teleco parts with which they could repair their customers' "Code-A-Phones", amounted to a violation of Section 1 of Title 79.[3]

It has long been recognized that every agreement concerning trade, and every regulation of trade, restrains trade to some extent, and that the very essence of such agreements is to bind or restrain.[4] As a literal application of the provisions of 15

---

1. See *Bd. of Regents, etc. v. Nat. Collegiate Ath. Ass'n.,* Okl., 561 P.2d 499, 505 (1977).

2. 15 U.S.C., § 1, provides:

   "*Every contract, combination in the form of trust, or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.* Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding one million dollars if a corporation, or, if any other person, one hundred thousand dollars or by imprisonment not exceeding three years, or

by both said punishments, in the discretion of the court." [Emphasis added]

3. The evidence before the Trial Court showed that although Ford would no longer sell replacement parts *directly* to Teleco, replacement parts were available from several Ford distributorships. Of course, such parts were no longer available to Teleco at distributorship prices. Rather, Teleco had to pay either retail price, or a lesser price generally charged telephone companies. The true gravamen of Teleco's complaint was that such parts were no longer available to it at wholesale prices.

4. *Board of Trade v. United States,* 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918).

U.S.C., § 1, or 79 O.S.1971, § 1, would outlaw every conceivable contract or combination which could be made concerning trade or commerce, courts have read into such statute a "rule of reason", under which only those acts, contracts, agreements, or combinations which prejudice public interest by unduly restricting competition, or unduly obstructing the due course of trade, or which injuriously restrain trade, are unlawful.[5]

■ Thus, only unreasonable restraint of trade, as measured by the "rule of reason", constitutes a violation of 79 O.S., § 1. However, certain restraints of trade, because of their pernicious effect on competition and lack of any redeeming virtue, are conclusively presumed to be unreasonable and, therefore, per se violations.[6]

■ For the purposes of summary judgment, as there was conflicting evidence below, the distributorships established by Ford must be considered an exclusive distributorship. It is, however, well settled that it is not a per se violation of antitrust law for a manufacturer or supplier to agree with the distributor to give him an exclusive franchise or distributorship, *even if this means cutting off another distributor.* The United States Supreme Court recognized this in *United States v. Arnold, Schwinn & Co.,* 388 U.S. 365, 376, 87 S.Ct. 1856, 1864, 18 L.Ed.2d 1249 (1967). In that case, the United States Supreme Court stated:

" . . . a manufacturer of a product other and equivalent brands of which are readily available in the market may select his customers, and for this purpose he may 'franchise' certain dealers to whom, alone, he will sell his goods. Cf. *United States v. Colgate & Co.,* 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992, 7 A.L.R. 443 (1919). If the restraint stops at this point—if nothing more is involved than vertical 'confinement' of the manufacturer's own sales of the merchandise to selected dealers, and if competitive products are readily available to others, the restriction, on these facts alone, would not violate the Sherman Act. . . ."[7]

Thus, the creation of an exclusive distributorship does not, in and of itself, constitute a violation of antitrust provisions. However, the establishment of such a distributorship may constitute a violation under the "rule of reason", or when such a dealership is established as part of an overall scheme which includes illegal activities, such as price fixing,[8] conspiracy,[9] or exclusive dealing.[10]

In the case before us, Teleco argues that the creation of the exclusive distributorship by Ford resulted in Ford having a monopoly with respect to certain telephone answering equipment in a recognizable sub-market, and that such a monopoly constituted an unreasonable restraint of trade in that market, as measured by the "rule of reason".

---

5. *Standard Oil Company v. United States,* 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911); *United States v. E. I. du Pont de Nemours & Company,* 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956); and *United States v. American Tobacco Company,* 221 U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663 (1911).

6. *Times-Picayune Publishing Company v. United States,* 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953); and *United States v. Consolidated Laundries Corporation,* 291 F.2d 563 (N.Y. 1961).

7. For other cases involving similar holdings, see, e. g., *Lawlor v. National Screening Serv. Corp.,* 352 U.S. 992, 77 S.Ct. 526, 1 L.Ed.2d 540 (1957); *United States v. Columbia Steel Company,* 334 U.S. 495, 68 S.Ct. 1107, 92 L.Ed. 1533 (1948); *Dreibus v. Wilson,* 529 F.2d 170 (9th Cir. 1975); *Ace Beer Distribs. Inc. v. Kohn,*

*Inc.,* 318 F.2d 283 (6th Cir. 1963); *Packard Motor Car Company v. Webster Motor Car Co.,* 100 U.S.App.D.C. 161, 243 F.2d 418 (D.C.Cir. 1957); *Colorado Pump Supply Co. v. Febco, Inc.,* 472 F.2d 637 (10th Cir. 1973); and *Wisdom Rubber Industries, Inc. v. Johns-Manville Sales Corporation,* 415 F.Supp. 363 (D.Hawaii 1976).

8. *Cooper Liquor, Inc. v. Adolph Coors Company,* 506 F.2d 934 (5th Cir. 1975).

9. *Reliable Volkswagen Sales & Service Co., Inc. v. Worldwide Automobile Corporation,* 182 F.Supp. 412 (D.N.J.1960).

10. *Hathaway Motors, Inc. v. General Motors Corp.,* 1955 Trade Cases, ¶ 67,996 (D.Conn. 1955).

**1364**

In determining the unreasonableness of a given restraint, courts have used a "relevant market analysis".[11] Using this analysis, courts first determined what the relevant market is, then determined whether an unreasonable restraint exists within that market.

A relevant market is determined by consideration of two elements: (1) A relevant *geographic market*; that is, the geographical territorial area involved; and (2) a relevant *product market*—the type or area of goods or services in which the product which is subject to the restraint effectively competes.

Teleco readily admits that Ford's exclusive distributorship does not constitute a restraint of the general phone answering device product market. Rather, Teleco argues that a relevant *sub-market* within the general market exists, and that an unreasonable restraint of trade exists within that sub-product market.

In isolating a relevant *product market,* to determine whether a violation of 15 U.S.C., § 1, or 79 O.S., § 1, is present, a product market has been consistently held to include not only all products identical to the defendant's products, but also all products which are reasonably interchangeable with defendant's product, or which are reasonable substitutes for defendant's products.[12]

In order to prevail, Teleco has to establish the existence of a definite submarket, for the unreasonableness of a restraint upon the market cannot be determined unless the market has been reasonably defined.

In support of its summary judgment, Ford introduced much evidence showing that numerous phone answering devices, similar to those sold by Ford, and reasonably substituted for those sold by Ford, were available in the Oklahoma City area. This evidence negated Teleco's assertion that a relevant sub-product market existed.

In attempting to prove that a sub-market did exist, Teleco introduced a market survey in which some thirty-nine owners of "Code-A-Phones" were interviewed. The surveyor, with the help of Teleco, selected six "Code-A-Phones" features which were thought to be "unique features". Of the six features chosen, two were later shown not to be unique. A fact question exists as to the uniqueness of the other four features. Thus, for the purposes of summary judgment, we will assume that four of the six features chosen were unique.

The interviewee was asked whether his present "Code-A-Phone" had each of the "unique features," and then asked whether, if they were purchasing a new unit, would they demand that the new unit have each particular feature.[13] The survey indicated that two of the features were desirable to the people interviewed, and two were not. One of the features found to be desirable was the ability of the recording device to shut off immediately upon the caller's hanging up. Interviewees, however, were not told that competitive machines, which may not instantly shut off, do so within a few seconds. The second desirable device was a remote control device which allowed

**11.** *United States v. Grinnell Corp.,* 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); *United States v. Du Pont,* 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956); and *United States v. Columbia Steel Co.,* 334 U.S. 495, 68 S.Ct. 1107, 92 L.Ed. 1533 (1948).

**12.** *International Boxing Club v. United States,* 358 U.S. 242, 79 S.Ct. 245, 3 L.Ed.2d 270 (1959); *United States v. du Pont, supra;* and *Times-Picayune Publishing Company v. United States, supra.*

**13.** The four features involved were:

(1) The machines stopped recording *as soon as* the caller hung up. [The interviewees were not informed of the fact that competitive machines, which may not instantly shut off, do so within from ten to thirty seconds.]

(2) A remote air control device which cancelled and accumulated messages for the user from an outside telephone.

(3) The machine had a multi-channel out-going message capability by which the user could readily select from a set of pre-recorded messages.

(4) The control switch which allowed the user to select a pre-determined message length for incoming calls.

the owner to cancel and accumulate messages from an outside telephone. In short, the survey demonstrated that "Code-A-Phones" have some desirable features, which, for the purposes of summary judgment, were considered as unique.

However, the existence of a desirable and unique feature does not alone constitute evidence of a relevant sub-market. In its survey, Teleco only inquired about "Code-A-Phone" features, and only interviewed "Code-A-Phone" owners. In conducting the survey, Teleco offered no evidence of the availability or nonavailability of competitive and/or interchangeable equipment. This being the case, the only evidence before the Trial Court was the evidence offered by Ford, which showed that like and similar equipment was available in the Oklahoma City area.

In *United States v. E. I. Du Pont de Nemours & Company,* 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956), the United States Supreme Court held that the relevant product market was not confined to cellophane, but also included similar wrapping materials and other flexible packaging products, such as waxed paper and aluminum foil. The Court defined the relevant market to be that market which is composed of products that have "reasonable interchangeability" for the purposes for which they are produced. Thus, despite the fact that cellophane had unique characteristics, it was not found to compose or constitute a relevant sub-market, as other products could be reasonably interchanged with it. In the case before us, the only evidence with respect to interchangeability was that offered by Ford, which demonstrated that products manufactured by several other companies were reasonably interchanged with "Code-A-Phone" answering device. This being the case, we hold that summary judgment in favor of Ford was appropriate, for the establishment of an exclusive distributorship does not constitute a violation of Federal or State antitrust provisions, unless such is shown to be part of other illegal activities, or is shown to result in an illegal monopoly in a relevant market. As there was no evidence before the Trial Court demonstrating the existence of an illegal scheme, or defining a relevant sub-market in which a possible illegal monopoly might exist, Teleco failed to support its allegations with any evidence. In so ruling, we note that not even Teleco argued or asserted that any illegal restraint of trade or monopoly existed with respect to the general phone answering device market. Rather, Teleco's entire case rested upon the existence of a relevant sub-market which was not shown to exist.

In *Weeks v. Wedgewood Village, Inc.,* Okl., 554 P.2d 780 (1976), we stated:

"A party cannot rely on his own pleadings in opposition to affidavits and depositions supporting a motion for summary judgment. The mere assertion in a pleading, when attacked by a motion for summary judgment supported by proof of specific facts in the form of an affidavit or deposition, places on the author of the statement the obligation to present something which will show that when the date of trial arrives, he will have some proof to support the allegations in the pleading. He cannot withhold this showing until the time of trial."

In the case before us, Teleco failed to meet this burden, thus summary judgment in favor of Ford was proper.

AFFIRMED.

All the Justices concur.