**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 3 2001**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

TRIGEN-OKLAHOMA CITY
ENERGY CORPORATION,

      Plaintiff - Appellee - Cross-
      Appellant,

vs.

OKLAHOMA GAS & ELECTRIC
COMPANY,

      Defendant - Appellant - Cross-
      Appellee,

----------------------

EDISON ELECTRIC INSTITUTE,

      Amicus Curiae.

Nos. 00-6047 and 00-6068

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. No. 96-CV-1595-L)

---

Paul D. Clement (Kevin R. Sullivan, Jeffrey S. Bucholtz and Jeffrey S. Spigel, King & Spalding, Washington, DC, and James A. Kirk, James M. Chaney, Allen Campbell, Kirk & Chaney, Oklahoma City, Oklahoma, on the briefs), for Plaintiff - Appellee - Cross- Appellant.

Deborah H. Bornstein (John T. Cusack, with her on the briefs, Patrick J. Kelleher, Steven S. Shonder, Myriam Pierre Warren, Gardner, Carton & Douglas, Chicago, Illinos and Burck Bailey, Warren F. Bickford, IV, Dino E. Viera, Fellers, Snider, Blankenship, Bailey & Tippens, Oklahoma City, Oklahoma, on the briefs), for

Defendant - Appellant - Cross - Appellee.

Barbara A. Hindin (Edward H. Comer, on the brief), Edison Electric Institute, Washington, D.C., for Amicus Curiae.

_____

Before **KELLY** and **BRISCOE**, Circuit Judges, and **MURGUIA**[*], District Judge.

_____

**KELLY**, Circuit Judge.

_____

Trigen-Oklahoma Energy Corp. ("Trigen") sued Oklahoma Gas & Electric ("OG&E") in federal district court, alleging violations of the federal antitrust laws, Oklahoma antitrust laws, and Oklahoma tort law. A jury returned a verdict for Trigen on all counts except attempted monopolization, 15 U.S.C. § 2. The court awarded Trigen over $20 million in damages. OG&E appeals the jury's verdict and Trigen cross-appeals the damages award. We have jurisdiction pursuant to 28 U.S.C. § 1291. Because we find that OG&E is immune from federal antitrust liability under the state action doctrine and that Trigen's remaining claims are within the exclusive jurisdiction of the Oklahoma Corporation Commission ("OCC"), we reverse.

_____

[*] The Honorable Carlos Murguia, District Judge, United States District Court of Kansas, sitting by designation.

## Background

### A.  The Parties

Appellant-Defendant Oklahoma Gas & Electric Co. ("OG&E") is a regulated electric utility that serves communities in Oklahoma and Arkansas. The OCC and the Arkansas Public Service Commission regulate the rates, terms, and conditions for OG&E's retail electricity sales.  The Federal Energy Regulatory Commission regulates OG&E's wholesale electricity sales.  Aplt. Br. at 8.

Trigen, a wholly-owned subsidiary of Trigen Energy Corporation, operates urban and industrial "district heating-and-cooling systems" around the country. VI Aplt. App. at 1181-82.   In 1989, Trigen entered the Oklahoma City market by acquiring district heating-and-cooling plants from another company.  At its plants, Trigen produces steam and chilled water, which are then pumped from a central station through Trigen's underground pipeline to Trigen's customers.  In order to use Trigen's system, buildings must be accessible to Trigen's underground pipeline.  Trigen's Oklahoma City sales are not regulated.        Id. at 8-9.

OG&E and Trigen compete indirectly in Oklahoma City.  OG&E attempts to persuade Trigen's customers to purchase cooling equipment ("chillers") from a third party and install it in the customers' buildings.  Buildings that use electric

chillers consume more electricity for cooling than buildings served by Trigen. Obviously, buildings with electric chillers for cooling also do not need Trigen's services. Id. at 9; Aplee. Br. at 3. Significantly, without a chiller, OG&E's electricity is not a substitute for Trigen's district-cooling system. OG&E only sells electricity–it does not manufacture or sell chillers. OG&E also has no control over its electricity prices as its rates are set by the OCC. Aplt. Br. at 10.

B. The Conduct at Issue

At trial, Trigen sought twenty years of lost profits from OG&E based on three allegedly anticompetitive incidents. First, Trigen and OG&E competed for Oklahoma County's buildings. The County had originally signed a contract with Trigen in December 1989. However, this contract lapsed at the end of every fiscal year, as the Oklahoma Constitution prohibits political subdivisions from entering into contracts exceeding one fiscal year. I Aplt. Sep. Add. Ex. 85, ¶¶ 2-3. In 1993, the County Board became dissatisfied with Trigen's rates and began to investigate installing on-site electric chillers. OG&E conducted a study for the County that concluded the County could save significant amounts of money by installing on-site chillers. Convinced by the study, the County Board began negotiations with Trigen, with Trigen ultimately agreeing to reduce the County's capacity charge by about $200,000 annually. At trial, Trigen sought to regain these "lost profits" as damages from OG&E. Aplt. Br. at 17-18; Aplee. Br. at 5-

7.

Second, OG&E and Trigen competed to win the contract to serve the City's Myriad Convention Center. The City ultimately selected OG&E, after OG&E offered to include the City in the experimental Real Time Pricing ("RTP") tariff recently approved by the OCC. Aplt. Br. at 18. Under the RTP tariff, the customer is given a schedule of hourly prices a day (or a week) in advance, and the customer may adjust its usage accordingly. Id. at 20. The OCC's approval of the RTP program gave OG&E complete discretion to select customers. Id. An outside consulting firm, hired by OG&E, estimated (but did not guarantee) that by using RTP, the City could achieve an average rate of 1.8 cents per kilowatt-hour. Id. at 21. Trigen contends that OG&E misrepresented the RTP rate to the City. Aplee. Br. at 32-36. Again, Trigen sought lost profits as damages from OG&E.

Third and finally, OG&E and Trigen competed for the business of Corporate Tower, a non-governmental building. Trigen succeeded to the Corporate Tower contract when it entered the Oklahoma City market in 1989. Corporate Tower's contract with Trigen had a primary term of ten years, with two five-year renewal periods. Aplt. Br. at 25; II Sep. Add. Ex. DX5A at ¶ 2. The first of these renewal periods expired in September 1995. In anticipation of that expiration, OG&E attempted to persuade Corporate Tower to install an on-site

cooling system. To this end, OG&E provided information to the building manager on how to evaluate on-site cooling, offered to pay for a feasibility study, sponsored an informational breakfast meeting and an energy conference, and had its lawyers evaluate Corporate Tower's contract with Trigen for legal termination options. Aplt. Br. at 24-26. Corporate Tower decided to terminate its relationship with Trigen at the end of the first contract-renewal period and install on-site chillers and heaters. At trial, Trigen sought to recover twenty years of lost profits from the loss of Corporate Tower's business based on the assumption that, but for OG&E, Trigen would have received a twenty-year contract extension. See I Sep. Add. Ex. PX515.

C. The Litigation

In September 1996, Trigen filed this action in federal district court alleging monopolization and attempted monopolization in violation of § 2 of the Sherman Act, 15 U.S.C. § 2; unreasonable restraint of trade and discrimination in violation of Okla. Stat. tit. 79, §§ 1, 4; and tortious interference with contract and prospective business advantage. I Aplt. App. Doc. 2 (First Am. Compl.). The trial took place in December 1998, and the jury returned a verdict for Trigen on all counts except attempted monopolization. III Aplt. App. Doc. 23. OG&E made three motions for judgment as a matter of law: during trial, XI Aplt. App. at 3024-38, at the close of all the evidence, XII Aplt. App. at 3151, and after the

jury verdict, IV Aplt. App. Doc. 35. The trial court denied the motions. XI Aplt. App. at 3072; XII Aplt. App. at 3151; V Aplt. App. Doc. 47. In January 2000, the trial court trebled the damages award and entered judgment for $20,641,548 against OG&E. V Aplt. App. Doc. 48.

### Discussion

Trigen brought federal antitrust claims against OG&E, as well as state antitrust and tort claims. OG&E argues that a combination of the state action, Noerr-Pennington , and filed rate doctrines mandate that the court dismiss both the federal and state antitrust claims against it. OG&E also argues that the district court had no jurisdiction to hear the state tort claims against OG&E as the exclusive jurisdiction to hear such claims rests with the OCC. Because we hold that the state action doctrine mandates the dismissal of the federal antitrust claims, and that the state antitrust and tort claims are within the exclusive jurisdiction of the OCC, we decline to reach the Noerr-Pennington and filed rate doctrine defenses. Nor is it necessary to address OG&E's arguments concerning reversible error at trial, the damages award, or Trigen's cross-appeal.

A. The State Action Doctrine

OG&E contends that the state action doctrine immunizes its conduct from federal antitrust scrutiny in three ways: (1) all of Trigen's claims are based on

OG&E's efforts to sell electricity, and OG&E's electricity sales are immune from antitrust actions because the State has chosen to regulate them; (2) OG&E's offer to the City to participate in OG&E's pilot RTP program falls within the state action doctrine because the OCC expressly approved the RTP tariffs; and (3) the decisions of the City and County on whether or not to contract with Trigen are immune from antitrust actions, and this immunity extends to OG&E. Aplt. Br. at 32-33.

We see no significant legal difference between OG&E's first two grounds for state action immunity. The RTP program in which OG&E offered to enroll the City is just another state-regulated electricity sale. Therefore, we will treat OG&E simply as arguing that all of its regulated electricity sales are protected by the state action doctrine. This argument, standing alone, is enough to mandate dismissal of the federal antitrust claims. Accordingly, we need not address OG&E's third contention, that the City's and County's immunity under the state action doctrine should extend to OG&E.

At the outset, we must deal with the issue of waiver. Based on arguments that OG&E made at trial, Trigen argues that OG&E has waived state action immunity except with respect to OG&E's offer of the RTP rate to the city. See XI Aplt. App. at 3031; VI Aplt. App. at 1246. We disagree. Based on our review of the entire record, we find the issue of state action immunity to be

pervasive throughout the litigation. OG&E clearly raised the issue of state action immunity as applying to all of its regulated electricity sales in its answer, I Aplt. App. Doc. 3, ¶ 84, in the final pre-trial order, III Aplt. App. Doc. 26, ¶¶ 4G, 5B1, 5B6, and 5B11, and in its final motion for a judgment as a matter of law. IV Aplt. App. Doc. 35, ¶ 1. Significantly, in its order denying OG&E's motion, the district court did not hold that OG&E had waived state action immunity but denied the motion on the merits, albeit without analysis. V Aplt. App. Doc. 47 at 2. When first confronted with this issue during trial, the district court recognized that it could be dispositive of the entire case and queried why it was not raised in a motion for summary judgment. VI Aplt. App. at 1246. Although we agree that it is difficult to understand why OG&E did not file a dispositive motion prior to trial based on state action immunity, OG&E was not required to do so. Finally, state action immunity is a purely legal issue and Trigen has shown no prejudice due to OG&E's alleged waiver. Therefore, under these specific circumstances, we hold that OG&E did not waive its state action immunity.

We turn to the merits of OG&E's state action immunity claim. Because Oklahoma has clearly articulated a policy to displace competition with the regulation of electric utilities and because Oklahoma actively supervises any allegedly anticompetitive conduct, the state action doctrine immunizes OG&E's regulated electricity sales from federal antitrust scrutiny. State action immunity

- 9 -

is a question of law, which the court reviews de novo. In re Overland Park Fin. Corp., 236 F.3d 1246, 1251 (10th Cir. 2001). The state action doctrine arises from Parker v. Brown, 317 U.S. 341, 350-52 (1943), in which the Supreme Court relied on principles of federalism and state sovereignty to hold that the Sherman Act was not intended to prohibit states from imposing restraints on competition. In California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc., 445 U.S. 97 (1980), the Supreme Court set forth a two-pronged test for determining when private parties regulated by the state are shielded from the federal antitrust laws. First, the challenged restraint must be "one clearly articulated and affirmatively expressed as state policy," id. at 105 (internal quotations and citation omitted), and second, "the policy must be 'actively supervised' by the State itself." Id.

In order to meet the first prong of the Midcal test, a private party does not have to "point to a specific, detailed legislative authorization" for its challenged conduct; the State need only have made clear its intent to replace competition with a regulatory program in a particular field. Southern Motor Carriers Rate Conference, Inc. v. United States, 471 U.S. 48, 64 (1985) (internal quotations and citation omitted). In addition, the state policy does not have to compel the private party to engage in anticompetitive conduct. If the state policy expressly permits, but does not compel, anticompetitive conduct, the private party may still qualify for state action immunity. Id. at 61-62.

The second prong of the Midcal test, the "active supervision" requirement, "is designed to ensure that the state-action doctrine will shelter only the particular anticompetitive acts of private parties that, in the judgment of the State, actually further state regulatory policies." Patrick v. Burget, 486 U.S. 94, 100-01 (1988) (citation omitted). The active supervision requirement "mandates that the State exercise ultimate control over the challenged anticompetitive conduct." Id. at 101.

As a state-regulated electric utility, OG&E has clearly met the two-prong test for state action immunity. The Oklahoma Constitution manifests the State's intent to displace competition with regulation over electric utilities. The Oklahoma Constitution creates the OCC, Okla. Const. art. IX, § 15, and provides that the OCC "shall have the power and authority and be charged with the duty of supervising, regulating and controlling all . . . transmission companies doing business in this State, [and] in all matters relating to the performance of their public duties and their charges therefor . . . ." Okla. Const. art. IX, § 18. To that end, the OCC "shall . . . prescribe and enforce against such companies . . . such rates, charges, . . . and rules and regulations, and shall require them to establish and maintain all such public service, facilities, and conveniences as may be reasonable and just . . . ." Id. Any rates, charges, or rules and regulations that are inconsistent with those mandated by the OCC are "unlawful and void." Id.

We have previously recognized Oklahoma's intent to displace competition with the regulation of public utilities, holding that the state action doctrine immunized an Oklahoma electric utility from antitrust scrutiny in the market for leased outdoor lighting. Lease Lights, Inc. v. Public Service Co. of Okla., 849 F.2d 1330, 1333 (10th Cir. 1988) ("The Oklahoma Constitution gives the [OCC] the power to regulate public utilities . . . .").

The OCC also actively supervises OG&E, meeting the second part of the test for state action immunity. The OCC has "general supervision" over OG&E, including the power to fix all of OG&E's rates for electricity and to promulgate all the rules and regulations that affect OG&E's services, operation, and management. Okla. Stat. tit. 17, § 152(A). The OCC has "full visitorial and inquisitorial power to examine such public utilities," § 152(C), as well as "the powers and authority of a court of record," Okla. Const. art. IX, § 19, with exclusive jurisdiction over claims challenging any of the OCC's actions. Okla. Const. art. IX, § 24. In Lease Lights, we found that the use of similar authority over an electric utility satisfied the active supervision requirement. 849 F.2d at 1334.

Although Trigen never directly addresses OG&E's argument that all of its regulated electricity sales are protected by the state action doctrine, Trigen does offer several reasons why the state action doctrine should not apply in this case.

Trigen argues: (1) that "OG&E made improper payments to public officials, offered to provide discounted loans and construction-cost guarantees, disparaged Trigen, and lavishly entertained Trigen customers while sticking OG&E ratepayers with the bill," Aplee. Br. at 28; (2) that OG&E is competing in the cooling services market, which is unregulated, id. at 31; and (3) that OG&E misrepresented the RTP tariff, discriminated between customers in deciding who to enroll in the RTP pilot program, and has flexibility in setting RTP rates. Id. at 32-34. We will address each argument in turn.

### 1. Bribery, Conspiracy, and "Lavish Entertainment"

Trigen alleges OG&E used improper payments, undue influence, and lavish entertainment to gain business. Trigen does not spell out its legal argument here and cites to no legal authority, but we construe Trigen as arguing that OG&E's alleged "bad acts" somehow destroy OG&E's state action immunity. However, the Supreme Court has expressly rejected this notion, holding that there is no conspiracy or bribery exception to state action immunity. City of Columbia v. Omni Outdoor Adver., Inc., 499 U.S. 365, 378-79 (1991) (stating that "Congress has passed other laws aimed at combating corruption in state and local governments," and that "any action that qualifies as state action is ipso facto . . . exempt from the operation of the antitrust laws") (internal quotations and citation omitted, alteration in original). We can find no legal authority, and Trigen points

- 13 -

us to none, that dictates that OG&E's alleged "lavish entertainment" of customers causes OG&E to forfeit state action immunity. Therefore, even if OG&E had committed these alleged "bad acts," its state action immunity would remain intact.

2. Competition in the Unregulated Cooling Market

Trigen contends that OG&E is not entitled to state action immunity because OG&E is not participating in the regulated electricity market but in the unregulated cooling services market. We disagree. First, OG&E is selling only one thing–electricity at state-regulated rates. It does not sell the electric chillers that are necessary for cooling. According to Trigen's logic, OG&E must be deemed a competitor, and a potential monopolist, in every single product market that uses electricity to the exclusion of the suppliers of that market. Clearly, this is an unreasonable result.

Second, the case Trigen relies on, Cantor v. Detroit Edison Co., 428 U.S. 579 (1976), is distinguishable. In Cantor, the Court held that a Michigan electric utility's program distributing free light bulbs was not immune from the Sherman Act, even though the light-bulb-distribution program was included in the state-approved tariff, because there was no evidence that the state intended to regulate the electric light bulb market. Id. at 598. Cantor involved an electric utility that was distributing an unregulated product–light bulbs. OG&E has done no such

thing.  OG&E only sells electricity–at state-regulated rates.                    [1]

### 3. RTP Pilot Program

Finally, Trigen argues that OG&E has flexibility in setting its RTP rate and that this flexibility leads to "abuse" by OG&E, including misrepresentations and discriminatory withholding of the RTP rate.  Aplee. Br. at 34-36.  Specifically, Trigen argues that OG&E misrepresented the tariff to the City, and that OG&E unlawfully discriminated against its customers in deciding who to enroll in the pilot program.  Aplee. Br. at 33.  Trigen contends that OG&E's flexibility in determining the RTP rate means that the RTP rate is not actively supervised by the State and, therefore, outside the scope of state action.          Id. at 33-34.

We disagree with Trigen's premise.  OG&E has no discretion in setting its electricity rates.  The RTP rate is governed by strict formulas defined in the OCC-approved tariff.  Aplt. Reply Br. at 7.  Under the RTP program, the customer  is given discretion in determining his electricity rate by determining at what times of the day to use electricity.  Accordingly, OG&E could only offer the City an  estimate  put together by an outside consulting firm, based on certain

---

[1] At oral argument, Trigen's counsel argued that OG&E was able to manipulate its rates by offering inducements to the City such as financing packages and capital-cost guarantees for the construction of an on-site cooling plant.  However, as OG&E points out, and Trigen concedes, the City declined these offers, Aplt. Br. at 19; Aplee. Br. at 8, leaving no justiciable issue before this court.

assumed usage patterns.

Trigen's discrimination claim clearly is barred by the state action doctrine. In its approval of the RTP tariffs and pilot program, the OCC explicitly stated in its Final Order that "the proposed Day-Ahead and Week-Ahead Pricing Tariffs will not result in unjust or undue discrimination." III Aplt. Sep. Add. Ex. DX318 at 4. Even if the RTP program <u>did</u> result in discrimination, it would still be at the heart of the state action doctrine. The state action doctrine applies to immunize anticompetitive conduct from the federal antitrust laws when that conduct is undertaken pursuant to a clearly-articulated state policy that is actively supervised by the State. If Oklahoma wants to allow OG&E to discriminate in order to pursue a state policy and Oklahoma actively supervises the conduct at issue, than OG&E may discriminate and still fall within the bounds of the state action doctrine.

In sum, Trigen's arguments that OG&E's regulated electricity sales fall outside of state action immunity are unpersuasive. Therefore, because OG&E is acting in accordance with a clearly-articulated state regulatory program and because it is actively supervised by the OCC, we hold that OG&E's conduct falls within the heart of the state action doctrine and that the federal antitrust claims must be dismissed.

### B. The Remaining State Antitrust and Tort Claims

Next, we address Trigen's remaining state antitrust and tort claims. Because we construe all of Trigen's state law claims as collateral attacks on OG&E's filed rates, we hold that these claims are within the exclusive jurisdiction of the OCC. OG&E raises a narrower version of this argument on appeal, contending that only Trigen's state tort claims are within the exclusive jurisdiction of the OCC. [2] Aplt. Br. at 63-64. However, as we have an "independent obligation" to determine our own jurisdiction, we raise this issue sua sponte. FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 231 (1990); accord State Farm Mut. Auto. Ins. Co. v. Narvaez, 149 F.3d 1269, 1270-71 (10th Cir. 1998).

Oklahoma law subjects all grievances with tariffs to the exclusive jurisdiction of the OCC. The OCC has the powers of a "court of record," and must "enforce compliance with any of its lawful orders or requirements . . . ." Okla. Const. art. IX, § 19. "The authority of the [OCC] . . . to prescribe rates . . . [and] charges, . . . for . . . transmission companies, shall . . . be paramount . . . ." Okla. Const. art. IX, § 18. An appeal from an order of the OCC "affecting the rates, charges, services, practices, rules or regulations of public utilities . . . shall be to the Supreme Court [of Oklahoma] only . . . ." Okla. Const. art. IX, § 20. Finally, plaintiffs who bring lawsuits or collateral proceedings against public

---

[2] Trigen never responds to this argument.

- 17 -

utilities may not question the "reasonableness, justness, or validity of any rate, charge, service, practice, rule, regulation or requirement . . . prescribed by the [OCC] . . . ." Okla. Const. art. IX, § 24.

The Supreme Court of Oklahoma has made clear that it is willing to look behind the form in which an action is brought to determine whether the action is actually a collateral attack on rates. See Wilson v. Harlow, 860 P.2d 793, 800-01 (Okla. 1993) (holding that a petition styled as a negligence and intentional tort action was in reality a collateral attack on rates and, therefore, within the exclusive jurisdiction of the OCC). In this case, in each of the three competitive incidents of which Trigen complains, the heart of Trigen's complaint is that OG&E's rates are too low and that Trigen either had to lower its own rates in response or lose business. The only remedy Trigen seeks is "lost profits" as damages from OG&E. Therefore, we conclude that Trigen's state antitrust and tort claims are in fact collateral attacks on OG&E's filed rates, and that such attacks lie within the exclusive jurisdiction of the OCC.

We REVERSE the judgment and the case is remanded with directions to DISMISS the complaint. OG&E's motion to supplement the record is denied.