PAUL KELLY, JR., Circuit Judge,
dissenting.
I would reverse on three grounds and respectfully dissent. In my view, the district court erred (1) by defining the relevant market on summary judgment, (2) in allowing the jury to base antitrust liability on contracts that were subject to OCC regulation and thereby immune from collateral attack under the state action and exclusive jurisdiction doctrines, and (3) in allowing damages for future enforcement of contracts that are necessarily void as against public policy under the jury’s interpretation of the evidence.

1. Defining the Product Market on Summary Judgment.

Plaintiffs prevailed upon their state-law monopolization and restraint of trade claims,[1] which require proof of a relevant market. “A relevant market is determined by consideration of two elements: (1) A, relevant geographic market; that is, the geographical territorial area involved; and (2) a relevant product market-the type or area of goods or services in which the product which is subject to the restraint effectively competes.” Teleco, Inc. v. Ford Indus., Inc., 587 P.2d 1360, 1364 (Okla.1978) (italics in original). Despite genuine issues of material fact, the district court granted the Plaintiffs’ motion for summary judgment on relevant product market. The court defined the relevant market “as the provision of public pay phones and related pay phone services for the territory in Oklahoma in which SWBT operates as a Local Exchange Carrier.” Aplt.App. *1146 2149. It did so on the strength of its holding that SWBT’s expert’s conclusion concerning the interchangeability of pay phones and cell phones was “simply unreasonable given the facts in the record.” Id.
The district court incorporated its summary judgment ruling in its jury instructions defining the relevant market for the restraint of trade and monopoly claims. Aplt.App. 3470, 3483, 3500. According to this court, “the parties allowed the jury to determine which set of customers should be used in evaluating monopoly power,” the pay-phone location owners or the end-users (consumers) of pay-phone services.[2] Ct. Op. at 6.
We readily recognize that the district court could not have properly granted summary judgment on whether the relevant market includes cell phones as well as pay phones. See Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 468-69, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) (non-movant in antitrust case need only prove its inferences are reasonable, as opposed to “economically senseless”). Equally problematic is the district court’s exclusion of SWBT’s expert testimony on the product market issue without benefit of a Daubert analysis. See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); see also United States v. Velarde, 214 F.3d 1204, 1209 (10th Cir.2000) (“ [T]he [district] court must, on the record, make some kind of reliability determination.”) (emphasis in original). Yet this court concludes that “regardless of the interchangeability of pay phones and cell phones at the end-user level, there is no doubt that pay phones and cell phones are not interchangeable at the location-owner level, and that is the level where the Plaintiffs argued that Southwestern Bell has monopolized competition.” Ct. Op. at 12; see also id. at 20. Without question, the various “levels” of distribution for pay-phone services are implicated.
There is no dispute that defining the relevant market is a factual matter normally entrusted to the trier of fact, here the jury. See Reazin v. Blue Cross & Blue Shield of Kan., Inc., 899 F.2d 951, 975 (10th Cir.1990); Westman Comm’n Co. v. Hobart Int’l, Inc., 796 F.2d 1216, 1220 (10th Cir.1986); Telex Corp. v. Int’l Bus. Machs. Corp., 510 F.2d 894, 915 (10th Cir.1975) (per curiam). The jury should have been allowed to determine the relevant market because there was a factual dispute on summary judgment as to whether Plaintiffs theory was correct. See III Aplt. 743-48; V Aplt.App. 1281-83. This court’s holding that end-users of phone services do not matter is in considerable tension with the Supreme Court’s holdings that the relevant product market is made up of “commodities reasonably interchangeable by consumers for the same purposes,” meaning that the cross-elasticity of demand between products must be similar but need not be identical. United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 395, 76 S.Ct. 994, 100 L.Ed. 1264 (1956); see also United States v. Continental Can Co., 378 U.S. 441, 443, 84 S.Ct. 1738, 12 L.Ed.2d 953 (1964); Brown Shoe Co. v. United States, 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). While it is true that du Pont involved a consumer market for cellophane and flexible packaging and that Plaintiffs here allege that the market involves competing for pay phone locations of location owners, *1147 neither reason compels the Plaintiffs’ definition of the relevant product market.
In du Pont, the government accused du Pont of monopolizing the market for cellophane, and the issue before the Court was whether the relevant product market consisted of cellophane alone or all flexible wrappings. Id. at 380-81, 76 S.Ct. 994. Notwithstanding the government’s attempt to define the relevant market narrowly, the Court held “that cellophane’s interchangeability with the other materials mentioned suffices to make it part of this flexible packaging market.” Id. at 400, 76 S.Ct. 994.
In this case, the Plaintiffs argue for a narrower market, one lacking any interchangeable commodities. See Eastman Kodak, 504 U.S. at 481, 112 S.Ct. 2072 (holding that a relevant market may consist of a single product or service and must be evaluated from the perspective of the choices available to Kodak equipment owners). It is undisputed that no public cellphones are available to location owners. The contractual support for Plaintiffs’ theory — that the SWBT standard contract identifies the location owner as a “customer” — is illusory at best. See Aplt.App. 1115-16 (contract); see also Twin City Sportservice, Inc. v. Charles O. Finley & Co., 512 F.2d 1264, 1272 (9th Cir.1975) (relevant products were franchises available to concessionaire, not concession products marketed to consumers or concession services to major league baseball teams). The contracts actually provide that location owners are paid a commission by SWBT for “the right to install and maintain SWBT public pay telephone(s) and associated equipment (payphone equipment)” on their property. Aplt.App. 1115-16 (contract). This suggests that payphone service providers do not sell payphones or payphone services to location owners, but rather sell payphone services to traditional consumers (end users) and use the location owners as a method of distribution. In any event, as the district court acknowledged and the record confirms, the factual issues surrounding the relevant product market and the perspective from which it should be evaluated were hotly contested on summary judgment. ApltApp. 2142.
This circuit has cautioned about overly restrictive definitions of the relevant product market, notwithstanding that a potential distributor alleged antitrust injury from a manufacturer’s refusal to deal. In Westman, a distributor of kitchen equipment alleged that Hobart, a kitchen equipment manufacturer, refused to grant a distributorship in violation of § 1 of the Sherman Act. The district court viewed one type of distribution method (“one stop shopping”) as comprising the relevant product market. This court reversed, holding that the relevant product market must be defined by interchangeability of products from the perspective of consumers, not distributors. After noting that “the purpose of the antitrust laws is the promotion of consumer welfare,” West-man, 796 F.2d at 1220, the court stated:
In defining the relevant market as “one-stop shopping,” the trial court apparently focused on the system of product distribution rather than the market facing the consumer of restaurant equipment. The trial court’s focus justified the conclusion that “one-stop distribution” is an effective way to compete in the market. But the fact that “one-stop distribution” is an effective or even superior way to compete does not mean that the relevant market is limited to those who use that method of competition. “Any definition of line of commerce which ignores the buyers and focuses on what the sellers do, or theoretically can. do, is not meaningful.”
*1148 Id. at 1220-21 (citation omitted). Finding that other restaurant equipment was reasonably interchangeable, the court held “that the relevant product market at a minimum consisted of the products generally sold by restaurant equipment dealers, whether or not those dealers carried a wide enough range of products and brands to be classed as ‘one stop shopping’ distributors.” Id. at 1221 (emphasis added). Although Westman involved a § 1 claim, its holding concerning the relevant market is also fully applicable to a § 2 monopolization claim. See Thurman Indus., Inc. v. Pay ‘N Pak Stores, Inc., 875 F.2d 1369, 1373, 1378 (9th Cir.1989) (market definition required for § 1 and § 2 claim). The district court’s grant of summary judgment in this case foreclosed jury consideration of evidence that showed that cellphones competed for consumers’ business, took customers from payphone providers and constrained pricing, all of which could have enabled the jury to conclude cellphones were in the relevant market. See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 224-25, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993) (antitrust laws protect against injury to competition, not competitors); Beville v. Curry, 39 P.3d 754, 759-60, 764 (Okla.2001) (“The sine qua non of an antitrust claim is injury to competition.”) (emphasis in original), reh’g granted, (Oct. 9, 2001). In other words, SWBT was entitled to be heard by a jury on the allegation that it lacked the power to control market prices or exclude competition vis-a-vis the relevant market it contended for. See Aplees. Sim Reply Br. at 6 (arguing that monopoly claim verdict could be affirmed on either theory); see also Beville, 39 P.3d at 760 (“Market power is the preliminary threshold inquiry and is often dispositive of antitrust cases.”). One need not accept SWBT’s monopsony argument to conclude that the relevant market should have been decided by the jury, not the district court. See Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 459, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993) (holding that proof of relevant market is essential under § 2). The evidence plainly “present[ed] a sufficient disagreement to require submission to a jury....” Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

2. Rejecting the State-Action and Exclusive Jurisdiction Doctrines.

Although this court declines to decide whether the state-action doctrine applies to state antitrust claims, it seems clear that it does apply, contrary to the district court’s holding. Aplt.App. 3942-43. Oklahoma’s antitrust law is to “be interpreted in a manner consistent with federal antitrust law ... and the case law applicable thereto.” Okla. Stat. Ann. tit. 79, § 212; see also Teleco, Inc. 587 P.2d at 1362; Oakridge Investments, Inc. v. S. Energy Homes, Inc., 719 P.2d 848, 850 (Okla.Ct. App.1986). Nothing suggests that Oklahoma would reject the state-action doctrine which we have applied to federal antitrust claims in similar circumstances. See Trigen Oklahoma City Energy Corp. v. Oklahoma Gas & Elec. Co., 244 F.3d 1220, 1225-1226 (10th Cir.2001) (recognizing Oklahoma’s policy of allowing regulation instead of competition in electricity sales); S. Disposal, Inc. v. Tex. Waste Mgmt., 161 F.3d 1259, 1263 (10th Cir.1998) (recognizing Oklahoma’s policy of allowing regulation instead of competition in waste disposal services).
This court decides that the state action does not apply to the circumstances of this case because (1) “it is clear that no state policy expressly permitted Southwestern Bell to attempt to lock up customers contractually long beyond the November 1996 introduction of competition in an effort to *1149 stymie the competition,” and (2) “the state likely was not even aware of the full extent of Southwestern Bell’s lock up conduct, let alone exercising ultimate control over it.” Ct. Op. at 27-28.
Here, the state plainly made clear its intent to regulate telephone services, including payphone services, until the OCC permitted competition. See Okla. Const. art. IX, §§ 18, 34;[3] Okla. Stat. Ann. tit. 17, § 131 (OCC issues certificate of convenience and necessity); Okla. Stat. Ann. tit. 17, § 139.1 (directing the OCC to “promulgate and enforce operating requirements for coin-activated telephones and credit card-activated telephones available for public use owned or operated by corporation or persons other than telephone corporations authorized by the Commission to operate within service areas.”); Southwestern Bell Tel. Co. v. Oklahoma, 825 P.2d 262, 265 (recognizing that local exchange companies are a state-created exception to prohibition on monopolies); Aplt.App. 3711-3724 (1985) (OCC 1985 Tariff Order rejecting competitive payphones, and ordering that SWBT “be and hereby is the only authorized provider of coin phone service within its territory.”). Rather than concentrating on the particular field of regulation, this court focuses upon the effects of alleged anti-competitive conduct beyond November 1996. But the proper inquiry is whether Oklahoma intended to displace competition in the payphone market with a regulatory program until November 1996. See S. Motor Carriers Rate Conference v. United States, 471 U.S. 48, 64-65, 105 S.Ct. 1721, 85 L.Ed.2d 36 (1985). The answer is clear-not until the OCC determined how and when competition could begin did Oklahoma change its policy.
The OCC had ultimate control over SWBT’s alleged anti-competitive conduct, which goes to satisfy the two-part Midcal test for state action immunity. See Cal. Retail Liquor Dealers Ass’n v. Midcal Aluminum, Inc., 445 U.S. 97, 105, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980) (“First, the challenged restraint must be ‘one clearly articulated and affirmatively expressed as state policy’; second, the policy must be ‘actively supervised’ by the state itself.”) (citation omitted). Concerning the first part, the state need only permit the conduct to occur — approval is unnecessary. Trigen, 244 F.3d at 1226. As discussed above, Oklahoma plainly regulated the field. Concerning the second part, state officials must have and exercise power to review alleged anti-competitive acts. Patrick v. Burget, 486 U.S. 94, 101, 108 S.Ct. 1658, 100 L.Ed.2d 83 (1988).
We have twice concluded that Oklahoma’s pervasive regulation of electric utilities satisfied the “active supervision” requirement. See id.; Lease Lights, Inc. v. Pub. Serv. Co. of Okla., 849 F.2d 1330, 1334 (10th Cir.1988). In Trigen, we based satisfaction of the active supervision requirement on the OCC’s regulatory authority. 244 F.3d at 1226. In Lease *1150 Lights, we looked not only at the OCC’s grant of authority but also considered actual proceedings of the OCC. 849 F.2d at 1334.
In this case, not only OCC’s regulatory authority, but also its actual proceedings and rulemaking, support the active supervision requirement. Specifically in 1996, the OCC was concerned with competition and addressed it in a formal rulemaking proceeding which resulted in administrative regulations. ApltApp. 3725 (Notice of Rulemaking) (OCC proposed to establish rules including “what safeguards are necessary to protect the interest of competitive payphone service providers”); Aplt. Add. tab 8 Okla. Admin. Code, tit, 165, ch. 58 (Facilitation and Provisioning of Payphone Service); id. at tab 12 (OCC’s Agency Rule Report Establishing Pay Telephone Service Rules).
Tellingly, an assistant attorney general in arguing for the “fresh look” proposal before the OCC stated:
And it’s hard for me to imagine that anyone would seriously argue that existing payphone service contracts are not a significant barrier to new entrants. The incumbent LECs have had decades of monopoly status in order to identify the most lucrative sites within their service territories, and they have had months to gain a competitive advantage through going out and renegotiating those contracts. The payphone rules, we believe, should allow a renegotiation window.
Aplt. Add. tab 11 at 22 (Rick Chamberlain testimony before the OCC);[4] see also Aplt.App. 3729-3741 (Oklahoma Attorney General’s brief before OCC arguing that OCC had jurisdiction to consider payphone service and the location of payphones and existing LEC contracts were a barrier to competition). Various providers complained to the OCC about the renegotiation tactics of SWBT as hindering competition, even including SWBT’s May 1, 1996 letter to location owners. Aplt.App. 3743-3748 (Textel Communications, Inc.’s); 3752-3765 (Cherokee Communications, Inc.). The record reveals that parties were divided over the fresh look proposal, whether the OCC had jurisdiction to entertain it, and whether it was constitutional. Ultimately, the OCC voted against adopting it, but indicated its willingness to reconsider the matter with discussion and investigation, at the invitation of the industry. Aplt. Add. tab 12 at 11. All of this suggests that the OCC could and did consider the alleged anti-competitive conduct of SWBT. The fact that the OCC might not have been aware of the full extent of SWBT’s alleged anti-competitive conduct (which is pure speculation) or declined to intervene is of no moment — the heart of this case is SWBT’s pre-competition contracts which the OCC reviewed and allowed to remain in effect. SWBT’s alleged bad acts are insufficient to defeat state action immunity. See Trigen, 244 F.3d at 1227 (even if OG & E had committed certain improper acts in the regulated sale of electricity, state action immunity was proper).
*1151 The exclusivity of the OCC’s jurisdiction over matters concerning payphones is apparent. No appeal was taken from the OCC’s decision not to impose a fresh look. Although this court questions whether such an appeal could have been maintained, the constitutional provision allows an appeal “from any action” of the OCC “prescribing ... practices, rules or regulations” and “by any party affected, or by any person deeming himself aggrieved by any such action.... ” Okla. Const. art. 9, § 20. This is hardly a limited grant of standing. In the context of the fresh look proposal, the OCC was exercising its constitutional and statutory authority to promulgate the payphone rules and regulations. Aplt. Add. tab 12 at 3. The court’s suggestion that an appeal could not have been taken from agency inaction ignores the forest for the trees. Moreover, the Oklahoma Supreme Court has passed on OCC inaction before. Turpen v. Okla. Corp. Comm’n, 769 P.2d 1309, 1325 (Okla.1988) (OCC did not err in deciding to address imputed value issue later). Analogous to Trigen, the Plaintiffs’ state antitrust claims based upon pre-November 1996 conduct are nothing more than a collateral attack on the OCC’s right to supervise, regulate and control matters relating to the performance of transmission company public duties and of correcting abuses. See Okla. Const, art. 9, § 18. A major part of Plaintiffs’ case concerns SWBT’s pre-competition contracts, which the OCC reviewed and allowed to remain in effect and which plainly come within the OCC’s constitutional and statutory jurisdiction.

S. Allowing Damages for Future Enforcement of Contracts

The court is undoubtedly correct that antitrust damages are not subject to a rigorous standard of proof; estimates and reasonable inferences of damages are sufficient. See J. Truett Payne Co. v. Chrysler Motors Corp., 451 U.S. 557, 567, 101 S.Ct. 1923, 68 L.Ed.2d 442 (1981); Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 123, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969). At the same time, an antitrust plaintiff has the burden of proof and damages cannot be speculative. See Wells Real Estate, Inc. v. Greater Lowell Bd. of Realtors, 850 F.2d 803, 816 (1st Cir.1988). Future damages are permissible, but only to the extent that they are based upon past wrongdoing. Lawlor v. Loewe, 235 U.S. 522, 536, 35 S.Ct. 170, 59 L.Ed. 341 (1915).
In Oklahoma, a statutory antitrust action is in the nature of tort, and is not an action on contract. McDonald v. Amtel, Inc., 633 P.2d 743, 745 (Okla.1981). Here, however, the contracts were integral to the proof of damages. Whether based upon SWBT continuing to enforce its contracts or on the rationale of free and open competition beginning in 1996, the damage award in this case presupposes that SWBT’s anti-competitive acts will continue post-verdict and the contracts will continue to be enforced. This assumption is wrong as a matter of law. It must be remembered that the Plaintiffs prevailed upon their state-law restraint of trade claim and that such acts, and contracts which are the product of such acts, are “against public policy and illegal.” Okla. Stat. Ann. tit. 79, § 203(A); First Nat’l Pictures v. Pappe, 170 Okla. 279, 39 P.2d 526, 530 (1934) (“[I]f [a] contract was made in violation of the anti-trust laws, it was an illegal and unenforceable contract”); see also United States v. Addyston Pipe & Steel Co., 85 F. 271, 290 (6th Cir.1898) (holding that contracts where the primary purpose is to restrain trade are void). Plainly, the damage award based upon future damages is inappropriate and inconsistent with the objectives of antitrust law when an injunction against future anti-competitive conduct would solve the problem. See United *1152 States v. Or. State Med. Soc., 343 U.S. 326, 333, 72 S.Ct. 690, 96 L.Ed. 978 (1952).
A Conclusion.
The district court erred in defining the relevant product market and not applying the state action or exclusive jurisdiction doctrines to bar the Plaintiffs’ claims arising prior to payphone competition. The damages award represents impermissible future damages based upon future anti-competitive conduct that would be unlawful.
Because a new trial would be required on remand, the district court again would have to consider the admissibility of SWBT’s interrogatory answer and its draft response under the Noerr-Pennington doctrine. Given that the pre-November 1996 conduct is not actionable and that the district court found that the interrogatory was poorly worded and resulted in an accurate but incomplete response, this line of inquiry would carry an even stronger danger of unfair prejudice than before, even with a limiting instruction. Though it may be admissible under footnote 3 of Pennington, such evidence still has to shed some light on “the purpose and character of the particular transactions under scrutiny,” United Mine Workers v. Pennington, 381 U.S. 657, 670 n. 3, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), which would include transactions subsequent to November 1996. Plainly, the jury in this case was exposed to the theory that SWBT’s advocacy before the OCC demonstrated its intent to monopolize. ApltApp. 4708; Aplt. App. 8379-80 (closing argument). Though the district court instructed the jury to disregard an answer espousing this theory, it points to the need for caution with this evidence.

. Okla. Stat. Ann. tit. 79, § 203 provides in pertinent part:
A. Every act, agreement, contract, or combination in the form of a trust, or otherwise, or conspiracy in restraint of trade or commerce within this state is hereby declared to be against public policy and illegal.
B. It is unlawful for any person to monopolize, attempt to monopolize, or conspire to monopolize any part of trade or commerce in a relevant market within this state.
D. As used in this section:
1. "Monopolize” means:
a. the possession of monopoly power in the relevant market, and
b. the willful acquisition or maintenance of that power by exclusionary conduct as distinguished from growth or development
as a consequence of a superior product and/or service, business acumen, or historic accident;
2. "Monopoly power” means the power to control market prices or exclude competition;
See also Harolds Stores, Inc. v. Dillard Dep't Stores, Inc., 82 F.3d 1533, 1543-44 (10th Cir. 1996) (discussing elements of restraint of trade in Oklahoma).

. In defining the relevant product market as a matter of law, the district court effectively rejected SWBT’s contention that it should be evaluated at the level of the end users. This legal ruling is before us. See Ruyle v. Continental Oil Co., 44 F.3d 837, 841 (10th Cir. 1994).

. Okla. Const, art. 9, § 18 provides in part: The Commission shall have the power and authority and be charged with the duty of supervising, regulating and controlling all transportation and transmission companies doing business in this State, in all matters relating to the performance of their public duties and their charges therefor, and of correcting abuses and preventing unjust discrimination and extortion by such companies; and to that end the Commission shall, from time to time, prescribe and enforce against such companies, in the manner hereinafter authorized, such rates, charges, classifications of traffic, and rules and regulations, and shall require them to establish and maintain all such public service, facilities, and conveniences as may be reasonable and just, which said rates, charges, classifications, rules, regulations, and requirements, the Commission may, from time to time, alter or amend.

. The Plaintiffs argue that this transcript should be stricken as it was not before the district court. See United States v. Kennedy, 225 F.3d 1187, 1190-91 (10th Cir.2000). I would grant SWBT’s motion to supplement the record pursuant to Fed. R.App. P. 10(e)(2)(C), because the substance of Mr. Chamberlain's comments is contained in his testimony before the district court, Aplt.App. 4622, and the payphone regulatory system in Oklahoma was always an issue in this case. Further, given that the district court held that the state-action doctrine did not apply, inclusion of this transcript in no way results in the appellate court deciding an issue with evidence that might have made a difference to the district court.