EBEL, Circuit Judge.
Southwestern Bell Telephone Company appeals from a jury verdict finding it guilty of monopolistic behavior in violation of Oklahoma state law and assessing damages of over $7 million, trebled to over $20 million. At issue is Southwestern Bell’s domination of the Oklahoma pay phone market, a market it legally monopolized, under the oversight of the Oklahoma Corporation Commission (OCC), until November 1996. The plaintiffs are nine independent pay phone service providers whose efforts to compete with Southwestern Bell succeeded only in whittling down the latter’s market share to roughly 80 percent after two years of competition. On appeal, Southwestern Bell challenges several aspects of the district court’s rulings, most notably its definition of the relevant market. While we do not embrace the district court’s analysis in its entirety, we nevertheless believe that the challenged rulings were proper, and we therefore AFFIRM.
BACKGROUND
In the decades up until November 1996, Southwestern Bell enjoyed a legal monopoly over the provision of pay phone services in the state of Oklahoma. As early as 1990, the Oklahoma legislature had decided to move from monopoly to competition in this market, but it entrusted the implementation of that transition to the OCC, which failed to end Southwestern Bell’s monopoly until passage of the 1996 Telecommunications Act, 47 U.S.C. § 276(b), forced its hand. After a four-month rule-making proceeding, the OCC authorized new pay phone providers in November 1996, subject to certain regulatory requirements.
Pay phone service providers (“PSPs”) such as Southwestern Bell and the Plaintiffs typically do not own the land on which the pay phones are located. Rather, they make a deal with the party that owns the land (“location owner”): the PSP gets permission to place the pay phone on the location, and in exchange the location owner gets a commission, typically a percentage of the phone’s receipts.
The Plaintiffs’ evidence at trial showed that, prior to the Oklahoma legislature’s 1990 decision to end its pay phone monopoly, Southwestern Bell had projected that it would lose 77 percent of its pay phone revenues in the first year of open competition. (The facts discussed here were disputed at trial and are presented in the light most favorable to the Plaintiffs.) In response, in 1991 Southwestern Bell undertook an intentional campaign to make entry into the Oklahoma pay phone market more difficult by attempting to secure every possible pay phone location through long-term contracts between Southwestern Bell and the location owners. This “lock up” campaign continued through 1996 and *1129 accelerated dramatically with what Southwestern Bell termed “the Blitz” in 1995-96 on the eve of the coming of competition.
The contracts contained several provisions designed to freeze out Southwestern Bell’s competitors, including automatic renewal terms and stiff penalties for early termination.[1] In addition to the lock up, Southwestern Bell employed several other measures to freeze out competition, including erecting a bureaucratic maze to discourage location owners who tried to terminate their contract, failing to remove its pay phones when requested to do so, and damaging the pay phone location when removing a phone.[2]
Southwestern Bell’s anti-competitive actions were highly successful. Although its competitors offered better commissions to location owners and better phones at cheaper rates to customers, at the end of the second year of competition Southwestern Bell retained more than 87 percent of the market, with no single competitor above 2.4 percent.
The Plaintiffs filed suit against Southwestern Bell claiming violations of federal and state antitrust law. The district court issued four different written decisions, two pre-trial and two post-verdict. The first order, filed March 1, 2000, dealt with the relevant product market pursuant to cross-motions for summary judgment. The Plaintiffs argued that the relevant market was the provision of pay phone facilities and services to location owners. Southwestern Bell argued that the product market should be evaluated from the viewpoint of the end-user of the phone services and should therefore include both pay phones and cell phones, which Southwestern Bell argued were reasonably interchangeable at the end-user level. The district court did not address whether the market should be evaluated at the level of the location owners or at the level of the end-users, but it did rule that pay phones and cell phones were not reasonably interchangeable, and thus, that the market should be limited to pay phones. Ultimately, the jury instructions submitted by the district court defined the relevant market simply as “the provision of pay phone and pay phone related services” without differentiating whether it should be evaluated at the level of the location owners or at the level of the end-users. Southwestern Bell does not claim to have objected to this instruction, so it is clear that the parties allowed the jury to determine which set of customers should be used in evaluating monopoly power.
The second order, filed March 23, 2000, addressed various motions in limine, none at issue on appeal. The third order, filed January 31, 2001 (after the jury found Southwestern Bell hable for state antitrust violations but not liable for federal antitrust violations), rejected Southwestern Bell’s motion for a new trial on the issue of *1130 damages. The central contention addressed in that order was whether the damages awarded were based improperly on anticipated future illegal conduct. The fourth order, also filed January 31, 2001, rejected Southwestern Bell’s motion for judgment as a matter of law or new trial. That motion argued, inter alia, that the jury improperly was allowed to consider Southwestern Bell’s lobbying efforts before the OCC and its pre-November 1996 conduct, that the verdict failed to account for the temporary contractual nature of Southwestern Bell’s market power, and that the verdict violated the state action doctrine. Southwestern Bell appeals the district court’s resolution of all of these issues.
DISCUSSION
The district court had jurisdiction over the federal antitrust claims pursuant to 28 U.S.C. § 1337 and over the state antitrust claims pursuant to 28 U.S.C. § 1367. We have jurisdiction under 28 U.S.C. § 1291.
A. Relevant Product Market
The first step in analyzing a monopoly claim is to define the relevant market in which the defendant was operating. See Full Draw Prods, v. Easton Sports, Inc., 182 F.3d 745, 756 (10th Cir.1999); SCFC ILC, Inc. v. Visa USA, Inc., 36 F.3d 958, 966 (10th Cir.1994). The relevant market inquiry has two components: geographic market and product market. Full Draw Prods., 182 F.3d at 756. Only the latter is at issue in this appeal. Southwestern Bell contends that the relevant product market should include cell phones as well as pay phones, while the Plaintiffs argue that the market is limited to pay phones. The parties’ underlying interests in this regard are conflicting: Southwestern Bell wishes to define the market as broadly as possible (which would make it more difficult for a jury to find that it exercised monopoly power), and the Plaintiffs wish to define the market as narrowly as possible (which would make it easier to find monopoly power). The parties filed cross-motions for summary judgment on market definition, and the court granted the Plaintiffs’ motion, ruling that cell phones were not part of the relevant market.
We have previously explained the relevant product market analysis as follows:
The market power query begins with the determination of the relevant market, that is, a market relevant to the legal issue before the court. The market which one must study to determine when a producer has monopoly power will vary with the part of commerce under consideration. The tests are constant. That market is composed of products that have reasonable interchangeability for the purposes for which they are produced — price, use and qualities considered. We also look to the geographic reach of the group of sales or sellers to determine the relevant market. Further, because the ability of consumers to turn to other suppliers restrains a firm from raising prices above the competitive level, the definition of the relevant market rests on a determination of available substitutes.
To define a market in product and geographic terms is to say that if prices were appreciably raised or volume appreciably curtailed for the product within a given area, while demand held constant, supply from other sources could not be expected to enter promptly enough and in large enough amounts to restore the old price and volume.
Although these concepts provide a shorthand for rule of reason analysis, we *1131 would be amiss to imply their application is necessarily facile. Each may be problematic:
There is no subject in antitrust law more confusing than market definition. One reason is that the concept, even in the pristine formulation of economists, is deliberately an attempt to oversimplify — for working purposes — the very complex economic interactions between a number of differently situated buyers and sellers, each of whom in reality has different costs, needs, and substitutes....
By defining the relevant market, however, we identify the firms that compete with each other. Plugged into the market power inquiry, we may then determine whether the alleged anticompeti-tive activity restrained trade, that is, raised price or reduced output.
SCFC ILC, Inc., 36 F.3d at 966 (internal quotation marks, citations, and alterations omitted). It is well settled that defining the relevant market is an issue of fact, Westman Comm’n Co. v. Hobart Int’l, Inc., 796 F.2d 1216, 1220 (10th Cir.1986), but we review the district court’s grant of summary judgment on that issue de novo. Simms v. Okla. ex rel. Dep’t of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1326 (10th Cir.1999).
Most of the district court’s discussion of the relevant product market issue was devoted to explaining why Southwestern Bell’s submissions on this issue (arguing that the relevant market included cell phones) were unpersuasive. However, although the inadequacies of Southwestern Bell’s relevant market evidence do support the district court’s denial of Southwestern Bell’s motion for summary judgment on the relevant market issue (which denial Southwestern Bell does not challenge on appeal), they do not support the court’s grant of summary judgment on the issue in favor of the Plaintiffs. Because the Plaintiffs had the burden of proof on the relevant market issue, Tarabishi v. McAlester Reg’l Hosp., 951 F.2d 1558, 1569 n. 15 (10th Cir.1991), the Plaintiffs were obligated to make an affirmative showing of their proposed relevant market sufficient to sustain a reasonable jury finding. See McKnight v. Kimberly Clark Corp., 149 F.3d 1125, 1128 (10th Cir.1998) (“[WJhere the nonmoving party will bear the burden of proof at trial on a dispositive issue, that party must go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to that party’s case in order to survive summary judgment.” (internal quotation marks omitted)).
The district court’s belief that the Plaintiffs had satisfied their burden was based on its view that certain consumers would not purchase cell phones no matter how much Southwestern Bell raised the rates for pay phone services. We do not believe that such an assertion, even assumed to be true, justifies excluding cell phones from the relevant product market (assuming for the moment that the product market has to be evaluated at the end-user level).
The basic relevant product market test is “reasonable interchangeability.” SCFC, 36 F.3d at 966. Interchangeability may be measured by, and is substantially synonymous with, cross-elasticity. Brown Shoe Co. v. United States, 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962); Westman Comm’n Co., 796 F.2d at 1221. A market is elastic if demand goes down as price goes up. A market is cross-elastic if rising prices for product A cause consumers to switch to product B.
The district court held that, because “common sense” suggests that there exist some people (namely, poor people who use pay phones because they have no phone *1132 service at home or work) who would not switch to cell phones if pay phone prices increased, therefore Southwestern Bell’s definition of the relevant product market to include cell phones was illogical. The problem with that reasoning is that neither the court below nor the parties on appeal cite anything in the record to support a conclusion that the number of “non-cross-elastic” pay phone users was significant enough to render the market as a whole non-cross-elastic. (Indeed, neither the court below nor the parties in the briefing point to anything in the record to support the district court’s conclusion that non-cross-elastic pay phone users exist at all, although surely some must.) Thus, this is not a case where the summary judgment movant (the Plaintiffs) alleged record-supported facts which the non-movant (Southwestern Bell) failed to rebut.
Therefore, the district court’s belief that there are non-cross-elastic pay phone users does not provide a sufficient basis for granting summary judgment in favor of the Plaintiffs as to the scope of the relevant market. The remainder of the district court’s stated basis for its ruling is equally unavailing:
[Although cell phones and pay phones perform similar functions, these items are not reasonably interchangeable. Local calls may be made on a pay phone for approximately thirty-five cents. A pay phone user does not need to make the financial or contractual commitment associated with cellular telephone service. A pay phone is stationary and available to anyone in the vicinity. In contrast, a cell phone is available only to those in possession of such equipment.
Reasonable interchangeability does not depend upon product similarity, a point well summarized in the ABA’s treatise on antitrust law:
Many courts have addressed the situation where two or more products or services have similar functions but different physical characteristics. These cases make clear that the relevant inquiry remains whether the differences in type render the products poor substitutes and that the resolution of this question depends on the evidence in the case. In du Pont, for example, the Court concluded that all flexible wrappings belonged in the same market, notwithstanding differences in burst strength, gas permeability, grease resistance, and other factors. The Court based its conclusion upon the extensive competition that existed between cellophane and other pliable wrappings, despite cellophane’s physical advantages.
1 ABA Section of Antitrust Law, Antitrust Law Developments 508 (4th ed.1997). Although the product differences cited by the court below are all reasons that the jury might rely upon were it to find that the relevant market did not include cell phones, we cannot agree that such differences support summary judgment on this factual issue.
However, regardless of the interchangeability of pay phones and cell phones at the end-user level, there is no doubt that pay phones and cell phones are not interchangeable at the location-owner level, and that is the level where the Plaintiffs argued that Southwestern Bell has monopolized competition. In other words, the Plaintiffs argue that Southwestern Bell’s interchangeability argument is wrongly directed at showing that cell phones and pay phones are interchangeable for end-users, but that is not the market where the Plaintiffs are complaining of Southwestern Bell’s anti-competitive behavior. Rather, it is the location owners who define the market where the anti-competitive behavior took place — •that is, the Plaintiffs claim that they compete with Southwestern Bell *1133 for locations upon which to place their payphones, and that is the market Southwestern Bell has monopolized.
Southwestern Bell insists that, despite the fact that it competes with the Plaintiffs in supplying pay phones to location owners, the end-user market for telephone services must still be considered. In support of this assertion, Southwestern Bell first argues that “market power must be identified from [the consumer’s] perspective.” The only support Southwestern Bell offers for this assertion is United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). But du Pont does not support the proposition for which it is cited; the Court there merely stated that “[i]n considering what is the relevant market for determining the control of price and competition, no more definite rule can be declared than that commodities reasonably interchangeable by consumers for the same purposes make up that part of the trade or commerce, monopolization of which may be illegal.” Id. at 395, 76 S.Ct. 994 (internal quotation marks omitted). The reference to consumers makes perfect sense in du Pont given that the market at issue (sale of cellophane wrap and other flexible wrappings) indisputably was a consumer market. Although Southwestern Bell is correct that antitrust laws were “especially intended to serve consumers,” that hardly suffices to prove that a monopolist may act with impunity so long as end-use consumer prices are unaffected. And, in any event, the Plaintiffs’ antitrust theory was that the location owners were consumers of the placement of pay phone facilities on their locations, and that the price for such location placements was affected by Southwestern Bell’s monopolistic conduct.
Southwestern Bell also argues that the relevant market should include the end-user market (and thus include cell phones) because pay phone service providers like Southwestern Bell are properly viewed as buyers rather than sellers in their relationships to location owners. That is, Southwestern Bell argues that the location owners are not “customers” of Southwestern Bell at all; Southwestern Bell argues that it is the customer of the location owners.[3]
Thus, Southwestern Bell attempts to characterize this action as a “monopso-ny” claim.[4] A monopsony, Southwestern Bell argues, is not actionable unless it “injure[s] consumers by forcing up the price of the end product. Where the risk of that happening is slight or nonexistent, however, monopsony power per se does not create an antitrust concern.” Ka-mine/Besicorp Allegany L.P. v. Rochester Gas & Elec. Corp., 908 F.Supp. 1194, 1203 (W.D.N.Y.1995). Thus, because the end-users’ ability to switch from pay phones to cell phones prevented them from being harmed by Southwestern Bell’s monopso-ny,[5] Southwestern Bell contends that its conduct is not actionable.
On its merits, Southwestern Bell’s mon-opsony argument is unpersuasive. The *1134 Supreme Court’s treatment of monopsony-cases strongly suggests that suppliers (under Southwestern Bell’s theory of the market, the location owners) are protected by antitrust laws even when the anti-eompeti-tive activity does not harm end-users. In its leading monopsony case, the Supreme Court stated:
It is clear that the [anti-competitive buyer’s price-fixing] agreement is the sort of combination condemned by the [Sherman] Act, even though the price-fixing was by purchasers, and the persons specially injured under the treble damage claim are sellers, not customers or consumers.
The statute does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers. Nor does it immunize the outlawed acts because they are done by any of these. The Act is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices by whomever they may be perpetrated.
Mandeville Island Farms v. American Crystal Sugar Co., 334 U.S. 219, 235-36, 68 S.Ct. 996, 92 L.Ed. 1328 (1948) (citations omitted). In Mandeville Island Farms, the Court held that the plaintiff sugar beet growers had stated a valid monopsony claim under § 2 of the Sherman Act against a sugar beet buyer who colluded with other buyers to pay uniform prices for beets. Significantly, as the two dissenting justices observed, the plaintiffs’ complaint did not allege that the defendants’ actions affected end-user prices. Id. at 247-48, 68 S.Ct. 996 (Jackson, J., dissenting).
Tenth Circuit case law also appears to reject the notion that a monopsony plaintiff must prove end-user impact. In Reaz-in v. Blue Cross & Blue Shield of Kansas, Inc., 899 F.2d 951 (10th Cir.1990), we rejected a monopsony defendant’s argument that injury to sellers without injury to end-users is not cognizable antitrust injury. Id. at 962; cf. Union Carbide & Carbon Corp. v. Nisley, 300 F.2d 561, 579-80 (10th Cir.1961) (“[T]he prolonged existence of a price-fixing conspiracy [by buyers] in an integrated industry such as ours is proof of damages to those [parties] whose prices are directly affected thereby. In that respect, our case is noticeably akin to Mandeville Island Farms v. American Crystal Sugar, 334 U.S. 219, 68 S.Ct. 996, 92 L.Ed. 1328.”). This approach is consistent with the case law of other circuits. See Khan v. State Oil Co., 93 F.3d 1358, 1361 (7th Cir.1996) (Posner, J.) (“This is a form of monopsony pricing, which is analytically the same as monopoly or cartel pricing and so treated by the law. E.g., Mandeville Island .... ” (dicta)), vacated on other grounds, 522 U.S. 3, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997); United States v. Syufy Enters., 903 F.2d 659, 663 (9th Cir.1990) (“[I]t is theoretically possible to have a middleman who is a monopolist upstream but not downstream.... ”).
An especially insightful analysis of relevant market analysis in monopsony cases comes from the Second Circuit. In Todd v. Exxon Corp., 275 F.3d 191 (2d Cir.2001), the plaintiffs were managerial, professional, and technical employees who brought a Sherman Act § 1 suit against fourteen major oil companies, alleging that the companies shared information about, and thereby artificially depressed, the salaries paid to such classes of employees. Id. at 195. The relevant market issue in Todd was slightly different than that at issue here, but the language used by the court in addressing that issue is directly relevant here. In Todd, the district court had held that the market proposed by the plaintiffs was over-inclusive to the extent that the plaintiffs had failed to show that the vari *1135 ous types of employees within the asserted relevant market (accountants, lawyers, engineers, etc.) were interchangeable with one another. Id. at 201. The Second Circuit rejected this conclusion:
[T]he market is not the market of competing sellers [the employees selling their services] but of competing buyers [the companies buying these services]. This market is comprised of buyers who are seen by sellers as being reasonably good substitutes. A greater availability of substitute buyers indicates a smaller quantum of market power on the part of the buyers in question.
.... Plaintiff is right to urge that the proper focus is ... the commonality and interchangeability of the buyers, not the commonality or interchangeability of the sellers. The question is not the interchangeability of, for example, lawyers with engineers. At issue is the interchangeability, from the perspective of a [managerial, professional, or technical] employee, of a job opportunity in the oil industry with, for example, one in the pharmaceutical industry.
Id. at 202 (citations omitted).
Opinions from other courts, as well as the writings of economists, reinforce this view. As Judge Wald summarized in a dissenting opinion:
The Supreme Court has clearly held that antitrust laws apply not only to restraints on output markets, but to input markets as well, including both labor, [citation omitted], and input commodities, e.g., [Mandeville Island Farms ] (sugar refiners’ agreement to fix input prices paid for sugar beets violates Sherman Act, which “does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers” but instead “is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices by whomever they may be perpetrated”). See also United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 223, 60 S.Ct. 811, 84 L.Ed. 1129 (1940) (Sherman Act prohibits any “combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity” and agreements to make “purchases [of inputs] at or under the market are one species of [unlawful] price-fixing”); American Tobacco Co. v. United States, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946) (applying antitrust law to restraints on input market for tobacco as well as output market for tobacco products); Swift & Co. v. United States, 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518 (1905) (same, for livestock inputs and meat outputs). Cf. National Macaroni Mfr’s Ass’n v. Federal Trade Comm’n, 345 F.2d 421, 426 (7th Cir.1965) (purpose and effect of agreement to fix composition of macaroni product was to depress input price of semolina, thereby violating Sherman Act).
Economists too have long recognized that market inefficiencies created by anticompetitive restraints on input markets can be as destructive of a free market economy (and therefore ultimately damaging to consumers) as restraints on output markets. See, e.g., ROGER D. BLAIR & JEFFREY L. HARRISON, MONOPSONY 36-43 (1993); see also Mandeville Farms, 334 U.S. at 241-44, 68 S.Ct. 996 (describing how restraints on input market adversely affect output market). While antitrust prosecutions for restraints on input markets are relatively rare, this is explained by the fact that restraints on input markets arise only in the unusual circumstance of an effective monopso-ny — a single purchaser, or a group of purchasers acting in concert. And mon- *1136 opsony in turn arises only when the resource is uniquely valuable in its current use, so that even if the price is depressed by monopsony, sellers are unable to find alternative buyers. RICHARD A. POSNER & FRANK H. EAST-ERBROOK, ANTITRUST 150 (1981) (monopsony can arise when "resources hav[e] substantially greater value in some uses than in others" so the "sole purchaser . . will . . . be able to force the [seller] . to accept a monopsony price"); BLAIR & HARRISON, supra, at 43-44 (inelasticity of supply facilitates collusive monopsony). Thus, for example, in the Mandeville Island Famis case, the sugar refiners' monopsonistic price-fixing scheme was effective because growers could not easily find other buyers or profitably switch to other crops when refiners conspired to fix the price of sugar beets. See 334 U.S. at 240-42, 68 S.Ct. 996. Nonetheless, according to the economists, there is a dead-weight loss associated with imposition of monopsony pricing restraints. Some producers will either produce less or cease production altogether, resulting in less-than-optimal output of the product or service, and over the long run higher consumer prices, reduced product quality, or substitution of less efficient alternative products. See, e.g., HERBERT HOVENKAMP, ECONOMICS AND FEDERAL ANTITRUST LAW § 1.2, at 17-18 (1985); BLAIR & HARRISON, supra, at 42-43, 72. So, even proceeding from the premise that antitrust laws aim only at protecting consumers, monopsonies fall under antitrust purview because monopsonistic practices will eventually adversely affect consumers.
Brown v. Pro Football, Inc., 50 F.3d 1041, 1061 (D.C.Cir.1995) (Wald, J., dissenting) (emphasis omitted), aff'd, 518 U.S. 231, 116 S.Ct. 2116, 135 L.Ed.2d 521 (1996). The two district court cases cited by Southwestern Bell-both of which contain language suggesting that harm to end-users is at least a relevant consideration in determining whether a monopsony is actionable under antitrust law, see Kamine/Besi-corp Allegany L.P., 908 F.Supp. at 1203 (stating that, where there is little risk that monopsony "can injure consumers by forcing up the price of the end product monopsony power per se does not create an antitrust concern"); Addamax Corp. v. Open Software Found., Inc., 888 F.Supp. 274, 280 (D.Mass.1995) (noting that "[o]nly with control of a downstream market can the monopsonist decrease output and raise prices")-are inadequate to overcome the unmistakable import of the case law cited above.
Accordingly, we affirm the district court's summary judgment ruling excluding cellular phones from the relevant market definition. Location owners are the relevant customers for purposes of locating Southwestern Bell's pay phone facilities, and from the location owners' perspective, cellular phone services and pay phone services are not interchangeable.
B. Noerr-Pennington Doctrine
The district court allowed the Plaintiffs to introduce evidence regarding allegedly misleading statements that Southwestern Bell made to the 0CC. Southwestern Bell argues that admission of such evidence violated its First Amendment right to petition the government, as embodied in the Noerr-Pennington doctrine. See United Mine Workers of Am. v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961). The district court held, and the Plaintiffs argue on appeal, that the evidence was admissible because it was *1137 offered, not for the improper purpose of showing that Southwestern .Bell violated antitrust laws by misleading the OCC, but rather for the proper purpose of supporting the claim that Southwestern Bell acted for an improper monopolistic purpose (namely, showing that the pre-competition campaign to lock up the market in long-term contracts was done for monopolistic purposes). We conclude that the district court’s admission of the evidence was not an abuse of discretion. See U.S. Football League v. Natl Football League, 842 F.2d 1335, 1374 (2d Cir.1988) (reviewing admissibility of evidence under Noerr-Penning-ton doctrine for abuse of discretion).
The Plaintiffs argued to the jury at trial that Southwestern Bell, upon realizing that competition was coming soon, engaged in an all-out effort (referred to as the “Blitz”) to lock as many location owners as possible into multi-year, automatically renewing contracts with unreasonable termination fees. Southwestern Bell argued that the Blitz was unrelated to the coming of competition, and was instead merely an effort to take advantage of new federal regulations allowing pay phone service providers to choose the long distance provider for the pay phone (“PIC rights”). The OCC, the state agency responsible for pay phone operations, considered ordering a “fresh look” rule that would have given location owners a window of time in which to void their existing contracts with Southwestern Bell in order to enter into a contract with another pay phone service provider. The state attorney general supported the fresh start, viewing it as an efficient alternative to fact-finding to determine whether Southwestern Bell was moving to lock up location owners in long term contracts.
Ultimately, the OCC decided against the fresh look, but during the course of its deliberations it submitted the following interrogatory to Southwestern Bell: “Please state whether Southwestern Bell Telephone is attempting to get all current payphone customers to sign a new contract. If so please state the reason.” Southwestern Bell replied “No.... Southwestern Bell is not attempting to obtain new contracts from all site owners that are currently under contract, nor is Southwestern Bell attempting to obtain contracts from all site owners with whom Southwestern Bell does not have a current contract.” In a draft answer to this question not submitted to the OCC, Southwestern Bell had drafted “Southwestern Bell Telephone has strived to secure a contract on all pay phones since 1988.” The draft answer went on to say that Southwestern Bell’s motivation to obtain long-term contracts was to enable it “to secure the placement long enough to protect the large investment.” Southwestern Bell’s cross-examination of the witness through whom this evidence was presented (Rick Chamberlain, formerly of the Oklahoma Attorney General’s office) suggests that its position was that it was not then “attempting” to get “all” customers to sign a new contract, as some of its existing customers already under contract were not contacted during the “Blitz.” In addition to objecting to the admission of the interrogatory response, Southwestern Bell argues generally that Chamberlain’s testimony improperly allowed the jury to consider the fact that Southwestern Bell opposed the fresh look proposal.
The Noerr-Pennington doctrine is rooted in the First Amendment. As we have explained previously, “the Noerr-Pennington doctrine provides general immunity from antitrust liability under the Sherman Act to private parties who petition the government for redress of grievances, notwithstanding the anti-competitive purpose or consequences of their petitions.” Cardtoons, L.C. v. Ma *1138 jor League Baseball Players Assoc., 208 F.3d 885, 894 (10th Cir.2000) (en banc). However, Noérr-Pennington does not bar the introduction of all evidence within its scope, as the Supreme Court recognized in footnote three of its Pennington decision: “It would of course still be within the province of the trial judge to admit this evidence, if he deemed it probative and not unduly prejudicial ... if it tends reasonably to show the purpose and character of the particular transactions under scrutiny.” 381 U.S. at 670 n. 3, 85 S.Ct. 1585.
Southwestern Bell argued to the trial court prior to introduction of this evidence that, under the Noerr-Pennington doctrine, “what we told the Corporation Commission can’t support any inference in the case and ought not come in at all.” The district court rejected this argument, expressly relying on Pennington footnote three. After cross-examining Chamberlain, Southwestern Bell requested, and the court immediately issued over the Plaintiffs’ objection, the following cautionary instruction to the jury:
Every citizen, including the plaintiffs and Southwestern Bell, has a right under the Constitution to petition the government and be heard on issues pertaining to rule-making proceedings like that at the Corporation Commission. The exercise of that right is immune from scrutiny under the antitrust laws. Therefore, I instruct you that Southwestern Bell Telephone Company’s exercise of it[s] right to petition by participating in rule-making proceedings and advocating any position it chose at the Oklahoma Corporation Commission did not violate the antitrust laws.
Later, the jury was instructed without objection that it may consider the purpose or intent of the anti-competitive act (i.e., the lock up efforts), and its pretextual nature, in assessing its legality. Further, the jury was specifically reminded per jury instruction that Southwestern Bell’s communications with the OCC “did not violate the antitrust laws,” but that “you may consider this evidence if you find it tends to show the purpose and character of the transactions under scrutiny.”
Southwestern Bell argues that introduction of the evidence from the OCC proceedings violated the Noerr-Pennington doctrine because it was offered for the sole purpose of convincing the jury to find an antitrust violation based on Southwestern Bell’s interactions with the OCC. The Plaintiffs counter that the evidence was not offered to establish monopolistic liability based upon Southwestern Bell’s interactions with the OCC, but rather to show that the “purpose” of the Blitz was to stifle competition, and that the explanation Southwestern Bell offered at trial (that the “Blitz” was to secure PIC rights) was pre-textual. The Plaintiffs argue: *1139 Restated, the Plaintiffs’ “purpose” rationale for the use of this evidence is that, if the true impetus for the Blitz had been to secure PIC rights, Southwestern Bell would not have submitted a misleading response to the OCC interrogatory. Because the draft response suggests that Southwestern Bell was willing to disclose one innocent explanation for its contracting, the argument goes, it follows that Southwestern Bell also would have relied on the innocent PIC explanation if that had been a motivating factor, and the fact that it did not do so tends to prove that the PIC theory was a post-hoc pretext. This rationale for the evidence’s admission falls within the scope of Pennington’s footnote three. Whether or not the jury would have found the evidence persuasive on this point, such an inference certainly would have been permissible.
*1138 In its opening statement and throughout trial, SWBT attempted to convince the jury that the Blitz was intended to secure ‘PIC’ long distance rights, not to preempt competition as Plaintiffs alleged. But SWBT’s response to the OCC’s factual inquiry does not contain any ‘PIC’ rights explanation for the Blitz. It also contradicted a ‘draft’ response in which SWBT admitted it had been attempting to get all its customers under contract for year's. Finally, it contradicted testimony from SWBT management that, on the eve of competition, SWBT sent contract solicitation letters to all of its Oklahoma customers not already under contract. SWBT’s response (and other evidence) proved SWBT’s ‘PIC’ rights justification was pretextual, and the true purpose of the Blitz was predatory.
*1139 Assuming that there is some proper purpose for admitting Southwestern Bell’s interrogatory response and draft response (along with testimony regarding the context of that exchange), Southwestern Bell argues that the evidence still was inadmissible under Pennington footnote three because the probative value did not outweigh the prejudice. We disagree. In light of the legitimate purpose underlying the evidence’s admission and the cautionary jury instruction given by the district court, admission of the evidence was not an abuse of discretion.[6]
C. State Action Doctrine
Southwestern Bell argues that “the state action doctrine (or analogous principles of state law) bars any use of SWBT’s pre-November 1996 contracts to prove antitrust violations.” The district court rejected Southwestern Bell’s state action arguments on the ground that the doctrine applies only to federal antitrust claims, not state antitrust claims for which Southwestern Bell was found liable here. State action immunity is a question of law, which we review de novo. See Trigen-Okla. City Energy Corp. v. Okla. Gas & Elec. Co., 244 F.3d 1220, 1225 (10th Cir.), cert. denied, - U.S.-, 122 S.Ct. 459, 151 L.Ed.2d 377 (2001). The Supreme Court has stated in the antitrust context that “state-action immunity is disfavored, much as are repeals by implication.” FTC v. Ticor Title Ins. Co., 504 U.S. 621, 623, 112 S.Ct. 2169, 119 L.Ed.2d 410 (1992).
We decline to address whether the state action doctrine applies to state antitrust claims. Even assuming that it does, the doctrine’s requirements are not met under the circumstances of this case. Private parties regulated by the state must show two elements in order to demonstrate that they are entitled to state action immunity. “First, the challenged restraint must be one clearly articulated and affirmatively expressed as state policy, and second, the policy must be actively supervised by the State.” Trigen, 244 F.3d at 1226 (internal quotation marks omitted). To meet the first prong, “the state policy does not have to compel the private party to engage in anticompetitive conduct. If the state policy expressly permits, but does not compel, anticompetitive conduct, the private party may still qualify for state action immunity.” Id. (emphasis added). Here, it is clear that no state policy expressly permitted Southwestern Bell to attempt to lock up customers contractually long beyond the November 1996 introduction of competition in an effort to stymie *1140 that competition. As the Plaintiffs note, the Oklahoma legislature’s 1990 decision to bring competition to the pay phone market (a decision not implemented until 1996) suggests an opposite state policy. The second prong “mandates that the State exercise ultimate control over the challenged anticompetitive conduct.” Id (internal quotation marks omitted). Here, the state likely was not even aware of the full extent of Southwestern Bell’s lock up conduct, let alone exercising ultimate control over it. The state action immunity doctrine does not apply to this case.[7]
Southwestern Bell offers a cursory alternative argument that the Plaintiffs’ claims are barred by the exclusivity of the OCC’s jurisdiction. The only authority cited in support of this argument is Trigen. However, Trigen is obviously distinguishable. All of the state antitrust claims in Trigen involved a challenge to rates charged by a regulated utility with a continuing legal monopoly. 244 F.3d at 1228 (stating that “we construe all of Trigen’s state law claims as collateral attacks on [Oklahoma Gas & Electric] filed rates”). The rates charged by thq utility were determined by the OCC, not by the utility. Id Trigen%’s conclusion that a challenge to the state-mandated rates charged by the utility amounted to an unlawful collateral attack was derived from the Oklahoma Constitution’s requirement that an “appeal from an order of the OCC ‘affecting the rates, charges, services, practices, rules or regulations of public utilities ... shall be to the Supreme Court [of Oklahoma] only....’ Okla. Const, art IX, § 20.” Id at 1228 (emphasis added, ellipses in original).
The exclusive jurisdiction of the OCC is not implicated here because, unlike the plaintiff in Trigen, the Plaintiffs are not challenging any order of the OCC, or any action by Southwestern Bell mandated by an order of the OCC. The OCC’s refusal to impose the fresh look does not imply that it was endorsing Southwestern Bell’s lock up campaign. To the contrary, the record suggests that the OCC’s ignorance of the lock up campaign’s scope may have contributed to its decision not to impose the fresh look. Although Southwestern Bell asserts that “plaintiffs chose not to appeal to the Oklahoma Supreme Court” the OCC’s decision not to adopt the fresh look, Southwestern Bell fails to offer any basis for concluding that such an appeal from agency inaction was available. See Okla. Const, art. 9, § 20. In any event, the Plaintiffs are not complaining about anything the OCC did or did not do. They are complaining about anti-competitive unilateral activity by Southwestern Bell that was neither mandated, nor authorized, nor reviewed, nor even known about by the OCC. Accordingly, we conclude that Southwestern Bell’s exclusive jurisdiction argument fails.
D. Market Power through Contracts
Southwestern Bell argues that the trial court improperly allowed the jury to consider the multi-year, automatically renewing contracts between Southwestern Bell *1141 and the location owners as evidence of market power. It argues that its contract power was limited because the duration of the contracts from which that power derived was limited; such necessarily temporary control of a market cannot constitute monopoly, it argues. The district court rejected this argument:
Defendant bases its argument ... on assumptions rejected by the jury. First, Defendant argues that entry into the pay phone market is easy. As noted by Plaintiffs, such an argument flies in the face of the testimony of numerous witnesses that Defendant’s contract activities had imposed substantial barriers to making a profitable entry into the market. Plaintiffs’ argument was bolstered by Defendant’s own internal memos reflecting an intent to make it hard for competitors to take customers away from Defendant. Further, the very language of Defendant’s contracts evidences a persistent control over the market. Weighing the evidence in favor of Plaintiffs as the Court must, there is clear support that Defendant’s intent and the actual effect of the contracts was that they can last forever. Not only did Defendant impose significant restrictions on how the contract could be terminated, it also severely restricted who could terminate a contract. Moreover, Defendant’s own internal memos reflect its intent that the contracts never terminated but had anniversary dates. This evidence was sufficient for the jury to find Defendant’s contracts were more than temporary or transitory. Finally, the jury was presented evidence that even when Plaintiffs secured a location in which to place a pay phone, Defendant’s actions of quoting high termination fees, removing equipment early, or failing to remove equipment, were directed at preventing the switch. Considering this evidence in the fight most favorable to Plaintiffs, it is clear the jury acted reasonably in finding Defendant held a monopoly.
On appeal, Southwestern Bell merely reasserts that temporary contract power cannot constitute monopoly power, making no effort to challenge the district court’s conclusion that the jury properly could have concluded that the contracts were meant to, and did, have a non-temporary (indeed nearly permanent) effect. That Southwestern Bell presented evidence from which the jury could have reached the contrary conclusion does not warrant reversal.
Southwestern Bell also argues that the district court erred in refusing to issue the following jury instruction:
If the evidence demonstrates that the defendant’s alleged restrictive, exclusionary or predatory conduct will necessarily be temporary, the defendant will not possess the degree of market power required for the monopolization or attempt to monopolize claim. An example of temporary conduct is conduct that is limited by the duration of a contract.
As given, Southwestern Bell argues, the instructions erroneously permitted the jury to premise monopoly liability on contract power, even if the jury did not accept the Plaintiffs’ arguments about the non-temporary nature of the contracts.
We review the court’s refusal to give a particular instruction for abuse of discretion. Coletti v. Cudd Pressure Control, 165 F.3d 767, 771 (10th Cir.1999). “We do not decide whether the instructions are flawless, but whether the jury was misled in any way and whether it had an understanding of the issues and its duty to decide those issues. So long as the charge as a whole adequately states the law, the refusal to give a particular requested instruction is not grounds for re *1142 versal.” Id. (internal quotation marks, citations, and alteration omitted).
Although Southwestern Bell offered its alternative instruction, there is no indication that it objected to the instructions the court did offer. As such, we review the court’s instructions for plain error. United States v. Foss, 82 F.3d 1521, 1530 (10th Cir.1996) (applying plain error review where “defendants cite then-own proffered instructions, [but] have not indicated a place in the record in which they objected to the court’s instruction”); Fed.R.Civ.P. 51 (“No party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection.”).
We reject Southwestern Bell’s challenge to the instructions, finding that the instructions as a whole were adequate to alert the jury to consider the duration of the effects of any anti-competitive contracts. The jury was told that, in determining “whether any of defendant’s practices were predatory or exclusionary,” it should consider various factors, including “the duration of any foreclosure of competition caused by [Southwestern Bell’s] conduct.”
Further, the district court properly rejected Southwestern Bell’s proffered instruction, which by listing “conduct that is limited to the duration of the contract” as an example of “temporary conduct,” would have misled the jury into believing that any anti-competitive conduct authorized by contract immunizes that conduct from state antitrust scrutiny. That tendered instruction further incorrectly assumed that contracts of any duration, even those contracts here that could be found to be essentially perpetual, should be considered “temporary” and thereby immune from the antitrust law. Thus, the tendered instruction was misleading and incorrect (as well as unnecessary in light of the correct instructions that were given). Thus, refusing to give that instruction was not error.[8]
E. Damages Based on Future Misconduct
Southwestern Bell argues that the damages awarded below necessarily and impermissibly reflect an award of future damages flowing from future misconduct. The district court rejected this argument:
[E]ven if Defendant immediately ceased all anti-competitive practices following the verdict, the effects of its prior bad acts would continue. Defendant still holds numerous long-term contracts which affect future competition. There was no suggestion or evidence at trial that those contracts would cease to exist or be terminated by defendant. Additionally, there was evidence of the business growth Plaintiffs would have experienced if allowed to enter a healthy *1143 market when it was newly opened if not for Defendant’s conduct.
We agree that the jury’s damages award is proper.
At trial, the Plaintiffs’ damages model totaled over $27 million, while Southwestern Bell’s damages model was under $1 million. The district court instructed the jury that it “may consider evidence relating to the profits each plaintiff has not received in the past, and will not receive in the future, because of defendant’s past unlawful conduct” (emphasis added), and forbade the jury to award purely speculative damages. The jury, per general verdict form not objected to by either party, awarded damages of $7,465,450.
Southwestern Bell faces a steep uphill climb in attempting to overturn the jury’s damages award. In addressing a challenge to a jury’s damages award in an antitrust case, the Supreme Court held that the award “must be allowed to stand, unless all reasonable men, exercising an unprejudiced judgment, would draw an opposite conclusion from the facts.” Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 566, 51 S.Ct. 248, 75 L.Ed. 544 (1931). This court has explained further that:
We review a district court’s disposition of a motion for remittitur or new trial on damages for a manifest abuse of discretion. ...
In order to establish an abuse of discretion, the party that moved unsuccessfully for a new trial on the basis of an excessive verdict carries the heavy burden of demonstrating that the verdict was clearly, decidedly, or overwhelmingly against the weight of the evidence. In applying the abuse of discretion standard, we are also mindful that absent an award so excessive or inadequate as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption or other improper cause invaded the trial, the jury’s determina,tion of the fact is considered inviolate.
Hynes v. Energy West, Inc., 211 F.3d 1193, 1206 (10th Cir.2000) (quoting Campbell v. Bartlett, 975 F.2d 1569, 1577 (10th Cir.1992)). We have said that, even where a “persuasive” explanation of the jury’s damages award indicates an award contrary to law, the possibility of a proper explanation, “[hjowever slight the chance,” will suffice to sustain the damages award. United Phosphorus, Ltd. v. Midland Fumigant, Inc., 205 F.3d 1219, 1228 (10th Cir.2000) (rejecting defendant’s double recovery claim, even though the damages were precisely the sum of the two amounts that could not be aggregated, because “the jury’s award was well within the range of proof’). Against this background, Southwestern Bell’s damages arguments fall short.
Both parties agree that, in an antitrust case, future damages may be recovered for past misconduct but not for future misconduct. The Plaintiffs focus their defense of the judgment on the proposition that the jury could have awarded the damages it did solely by reference to past misconduct. Looking only to the pay phone locations that they allegedly had already lost at the time of trial as a result of Southwestern Bell’s monopolistic behavior (1,863 pay phones), the Plaintiffs calculate that the total damages flowing from the deprivation of these 1,863 phones was $7,490,187 (roughly $35,000 greater than the jury awarded). Of this number, roughly $2.74 million is profits lost prior to trial, and the remainder is profits lost after trial as a result of Southwestern Bell’s continuing enforcement of its contracts with respect to these 1,863 phones.
Southwestern Bell does not challenge the Plaintiffs’ arithmetic, but does contest *1144 the logical underpinnings of their argument. It contends that the future enforcement of past contracts is future misconduct, not past misconduct. The essence of Southwestern Bell’s position is this: “Any damages from existing contracts are avoidable, either by SWBT ceasing to enforce unlawful contracts, or by an injunction barring their enforcement.” We do not believe that either ground justifies overturning the damages award.
First, Southwestern Bell contends that damages arising from the future enforcement of the contracts are avoidable because SWBT would stop enforcing “unlawful contracts.” Southwestern Bell acknowledges that, as the district court noted, it presented no evidence at trial that it would “ceas[e] to enforce” the contracts, but contends on appeal that “it is absurd to require a defendant, arguing that contracts are legal, to tender witnesses to promise that it would not enforce lawful agreements in the future.” However, Southwestern Bell never offered in the record any assurance that it would cease to enforce its contracts with location owners. Southwestern Bell suggests that such evidence is unnecessary because the law presumes that the antitrust defendant will obey the law, which compels the conclusion that Southwestern Bell would not enforce unlawful contracts. Southwestern Bell offers no authority, binding or otherwise, suggesting that the presumption of lawful behavior extends to the forfeiture of existing contract rights. Indeed, as the Plaintiffs note, they never sought a ruling on the enforceability of individual contracts, nor would such a ruling be proper in the absence of the thousands of contracting third-party location owners in this litigation. Presumably not all of the location owners would want to terminate their contracts with Southwestern Bell. If Southwestern Bell were to decide unilaterally that it would treat the contracts as null and void, it may expose itself to breach of contract claims by the location owners. This suit was about holding Southwestern Bell accountable to the Plaintiffs for its past monopolistic behavior, and the future enforceability of its contracts vis-a-vis all the location owners was simply not before the court. Under such circumstances, the district court was not obligated to assume that Southwestern Bell would voluntarily terminate its contracts with location owners.
Second, Southwestern Bell argues that the district court erred by upholding damages based upon future enforcement of past contracts rather than entering an injunction forbidding Southwestern Bell to enforce its contracts. As an initial matter, Southwestern Bell does not indicate that it requested or consented to such an injunction either before or after the jury decided the damages issue. Even assuming that the possibility of injunctive relief was raised before the district court, Southwestern Bell offers no support for its position that the possibility of issuing a contract-voiding injunction renders damages based upon continuing enforcement of the contracts improper as a matter of law. Neither of the cases cited by Southwestern Bell supports such a proposition. National Society of Professional Engineers v. United States, 435 U.S. 679, 697-98, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978), addressed the quite different question of whether a court could injunctively limit an antitrust defendant’s free speech rights. The interplay between the money damages for future action and the availability of injunctive relief was not even remotely implicated. The same may be said of the district court case cited by Southwestern Bell, Board of Regents v. NCAA, 601 F.Supp. 307 (W.D.Okla.1984). The case is
*1145 relevant only in that it provides an example of a decision to enjoin the enforcement of contracts found to violate the antitrust laws. See id. at 308. Southwestern Bell offers no relevant authority in support of its argument that the possibility of a contract-avoiding injunction forecloses the availability of damages based on future enforcement of continuing contracts. We perceive no justification for creating such a rule, and therefore reject Southwestern Bell’s argument. As the Supreme Court recognized in National Society of Professional Engineers, “[t]he standard against which the [district court’s] order must be judged is whether the relief represents a reasonable method of eliminating the consequences of the illegal conduct.” 435 U.S. at 698, 98 S.Ct. 1355. There is no reason to doubt that the jury’s damages award did just that.
CONCLUSION
The judgment below is AFFIRMED.[9]

. According to one witness, early termination fees could be as high as $7,200 on a location that might be paying the location owner only about $200 a year in commissions.

. By way of further example, many of Southwestern Bell’s contracts called for a 50% reduction in the commissions payable by Southwestern Bell to the location owner if the location owner allowed competitive pay phones on its location alongside Southwestern Bell’s pay phones. This was tantamount to precluding competitive pay phones because, in the unlikely event that the additional phones would increase total revenues for that location (there was evidence that Southwestern Bell would usually already have placed the optimal number of phones at a given location), the location owner would receive a much smaller percentage of those revenues. The damage Southwestern Bell did to the property when withdrawing its phones also made the property less attractive to providers of competitive pay phones.

.The contracts themselves do not establish whether Southwestern Bell is more properly-viewed as the buyer or seller, providing simply that the location owner, in exchange for prescribed commission payments, "hereby grants SWBT the right to install and maintain SWBT public pay telephone(s) and associated equipment ... at the location specified herein,” and that the phone remains the property of Southwestern Bell during the contract period.

. "Monopsony” is a "condition of the market in which there is but one buyer for a particular commodity.” Black’s Law Dictionary 1007 (6th ed. 1990).

. As stated earlier, at least on this record, the Plaintiffs have not yet demonstrated that cell phones and pay phones are not reasonably interchangeable at the end-user level.

. Southwestern Bell's challenges to the other aspects of Chamberlain's testimony fall flat, as the only testimony potentially problematic under Noerr-Pennington — the fact that Southwestern Bell opposed the fresh look proposal — was elicited by Southwestern Bell during cross-examination. See Whiteley v. OKC Corp., 719 F.2d 1051, 1055 (10th Cir.1983).

. Cf. Central Telecomm., Inc. v. TCI Cablevision, Inc., 800 F.2d 711 (8th Cir.1986), where the Eighth Circuit rejected a cable provider's argument that "as a matter of law, it could not have possessed monopoly power because [the municipality] regulated price and entry in the cable television business.” Id. at 726. The court recognized that TCI had the power to raise the price of premium channels without the approval of the municipality and that it "used its entrenched position and ... various unethical or illegal practices ... to exclude competition.” Id. Of course, in the case before us, Southwestern Bell cannot even claim that its long-term contracts with coercive terms and its anti-competitive "Blitz” were regulated, or even known, by the OCC.

. Southwestern Bell cites Colorado Interstate Gas Co. v. Natural Gas Pipeline Co., 885 F.2d 683 (10th Cir.1989), as support, but that case by no means forecloses the consideration of contractual activity in determining monopoly liability. In Colorado Interstate Gas, the potential monopolist's market power derived solely from a contract with a fixed expiration date, and the court found this to be an insufficient basis for monopoly liability under the circumstances in light of "the certainty that the market will return to the status quo at a predetermined date and the fact that [the alleged monopolist] has no power to prevent the erosion of its market share." Id. at 697 n. 24. By contrast, Southwestern Bell's liability was based on a whole system of contracts with exclusionary terms (including provisions that the district court found could cause many of them, in fact, to last forever), as well as an abundance of other anti-competitive conduct.

. All outstanding motions are denied.